UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MC ALLEN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL |
| | ) | |
| Plaintiff, | ) | McAllen, Texas |
| | ) | Wednesday, July 19, 2017 |
| vs. | ) | ( 9:03 a.m. to 10:37 a.m.) |
| | ) | (10:45 a.m. to 11:47 a.m.) |
| | ) | |
| JESUS MURILLO, | ) | CASE NO:  7:16-CR-01612-1 |
| MARELLA SANDOVAL, | ) | CASE NO:  7:16-CR-01612-2 |
| MIGUEL CERVANTES, JR., | ) | CASE NO:  7:16-CR-01612-3 |
| RENE HERNANDEZ, | ) | CASE NO:  7:16-CR-01612-5 |
| FELIX HERNANDEZ, | ) | CASE NO:  7:16-CR-01612-6 |
| | ) | |
| Defendants. | ) | |


SENTENCING

BEFORE THE HONORABLE MICAELA ALVAREZ,
UNITED STATES DISTRICT JUDGE


Appearances:                    See Next Page

Court Recorder:                 Candy Jones

Transcribed by:                 Exceptional Reporting Services, Inc.
                                P.O. Box 18668
                                Corpus Christi, TX 78480-8668
                                361 949-2988

THIS TRANSCRIPT HAS BEEN FURNISHED AT PUBLIC
EXPENSE UNDER THE CRIMINAL JUSTICE ACT AND MAY
BE USED ONLY AS AUTHORIZED BY COURT ORDER.
UNAUTHORIZED REPRODUCTION WILL RESULT IN AN
ASSESSMENT AGAINST COUNSEL FOR THE COST OF AN
ORIGINAL AND ONE COPY AT THE OFFICIAL RATE.
General Order 94-15, United States District Court,
Southern District of Texas.

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES FOR:**


Plaintiff:                  ROBERTO LOPEZ, JR., ESQ.
                            Assistant United States Attorney
                            1701 W. Business Hwy. 83, Suite 600
                            McAllen, TX 78501

Jesus Murillo:              ALEJANDRO BALLESTEROS, ESQ.
                            Ballesteros Gonzalez Law Firm, PLLC
                            3900 N. Tenth Street, Suite 980
                            McAllen, TX 78501

Marella Sandoval:           LILLY A. GUTIERREZ, ESQ.
                            Attorney at Law
                            4901 S. Jackson Road
                            Edinburg, TX 78539

Miguel Cervantes, Jr.:      DANIEL J. GARCIA, ESQ.
                            Attorney at Law
                            100 W. Fifth Street
                            Rio Grande City, TX 78582

Rene Hernandez:             GLENN D. ROMERO, ESQ.
                            Vidaurri Lyde Rodriguez & Haynes, LLP
                            202 N. Tenth Avenue
                            Edinburg, TX 78541

Felix Hernandez:            RICHARD (M.R.) GARZA, ESQ.
                            Attorney at Law
                            4610 S. Closner
                            Edinburg, TX 78539

U.S. Probation Office:      Eve Tijerina
                            1701 W. Business Hwy. 83
                            Suite 729
                            McAllen, TX 78501

3

**INDEX**

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| VINCENT PAUL RUBBO | | | | |
| BY MR. LOPEZ | 7/61 | | 76 | |
| BY MR. GARCIA | | 36 | | |
| BY MS. GUTIERREZ | | 39 | | |
| BY MR. GARZA | | 43 | | |
| BY MR. ROMERO | | 48 | | |
| BY MR. BALLESTEROS | | 56/62 | | |

4

1          **McAllen, Texas; Wednesday, July 19, 2017; 9:03 a.m.**

2                         **(Call to order)**

3          **THE COURT:**  This is Case Number 17-1612 [sic], as to

4    Jesus Murillo.

5          **MR. LOPEZ:**  Good morning, your Honor, Bob Lopez on

6    behalf of the Government, your Honor.

7          **MR. BALLESTEROS:**  Good morning, your Honor, Alejandro

8    Ballesteros on behalf of Mr. Murillo who's present and ready.

9          **THE COURT:**  Thank you.  Let me have the Defendants

10   remain seated until we're ready to proceed here, okay?  But I

11   will take the announcements.  And as to Marella Sandoval?

12         **MS. GUTIERREZ:**  Your Honor, Lilly Gutierrez on behalf

13   of Ms. Sandoval.  We're present and ready for sentencing.

14         **THE COURT:**  Thank you.  Miguel Cervantes?

15         **MR. GARCIA:**  Your Honor, Daniel Garcia on behalf of

16   Mr. Cervantes, we're present and ready.

17         **THE COURT:**  And Mr. Cervantes is present there, yes?

18   Okay, thank you.  Rene Hernandez?

19         **MR. ROMERO:**  Good morning, your Honor, Glenn Romero

20   on behalf of Mr. Hernandez.  We're present and ready for

21   sentencing.

22         **THE COURT:**  Thank you.  And Felix Hernandez?

23         **MR. GARZA:**  Your Honor, Richard Garza here, we're

24   present, we're also ready, Judge.

25         **THE COURT:**  All right, thank you.  Okay, because you

**EXCEPTIONAL REPORTING SERVICES, INC**

1   have various objections, some of which may be similar and some

2   of which are distinct, I want to go through those first before

3   I have all the parties standing in front of me.  I think it'll

4   be much more convenient for whoever's not involved in that

5   particular one to remain seated.  If there is anything that any

6   one of those attorneys wants to input as to any other issue

7   that comes up with a different defendant, I'm certainly willing

8   to hear from you, but I just think it'll be easier to sort of

9   work these through one by one.

10          **MR. LOPEZ:**  I agree, your Honor.  And to the extent I

11  don't know if the Court feels it more convenient or

12  appropriate, I do have my case agent, Vincent Rubbo, here that

13  I intend to place -- to testify regarding this whole conspiracy

14  and the actors.  I don't know if the Court would prefer that we

15  do that before addressing those objections or after.  I don't

16  know what the Court feels most convenient.

17          **THE COURT:**  Well, in that regard, is his testimony

18  just general testimony as to ultimately what the Court should

19  do based on the offense, or is it going to a particular issue

20  as to any one Defendant, or both?

21          **MR. LOPEZ:**  Your Honor, this is going more so to the

22  relevant conduct scope of --

23          **THE COURT:**  Okay.

24          **MR. LOPEZ:**  -- the scheme in terms of the

25  hierarchy --

6

1        **THE COURT:**  Okay.

2        **MR. LOPEZ:**  -- and in terms of each particular

3   Defendant's position within that hierarchy, --

4        **THE COURT:**  Okay.

5        **MR. LOPEZ:**  -- more so to speak, your Honor.

6        **THE COURT:**  Okay, well, in light of that then,

7   because there are some issues as far as some of the

8   enhancements based on role that we have here, so then I think

9   it might be best to go ahead and hear first from the agent.  Of

10  course he'll remain here in case something comes up as we move

11  forward.  So I'll hear from him first.  I'll give defense

12  counsel an opportunity to ask questions, and in particular if

13  it's going to role of those (indiscernible) more towards I

14  think Mr. Murillo that had a role enhancement and --

15       **MR. LOPEZ:**  Yes, your Honor, and I believe

16  Mr. Hernandez as well, your Honor.

17       **THE COURT:**  And Mr. Hernandez.  So in particular as

18  to those two, and then we'll come back and address the

19  objections themselves.  Okay, so let's go ahead and hear from

20  the agent to begin with.

21       **MR. LOPEZ:**  Your Honor, at this time the Government

22  will call Agent Vincent Rubbo.

23       **THE COURT:**  You go ahead and take the witness stand,

24  please.

25       **MR. RUBBO:**  Yes, ma'am.

1          **THE COURT:**  Before you are seated, however, please

2    raise your right hand to be sworn in.

3          **VINCENT PAUL RUBBO, GOVERNMENT'S WITNESS, SWORN**

4          **THE COURT:**  Thank you, you may be seated.

5          **MR. LOPEZ:**  Your Honor, and I know that we had this

6    set up previously to go ahead and play but I don't know if

7    anything needs to be switched to go ahead --

8          **THE COURT:**  Ms. Belmares will handle that part of it.

9    I will say we have a new system so we're still sort of getting

10   the hang of it.  Hopefully we don't have any problems here.

11   And I'm sorry, agent, give me your full name again, please.

12         **THE WITNESS:**  Yes, it's Vincent Paul Rubbo.

13         **THE COURT:**  Spell the last name for me, please.

14         **THE WITNESS:**  R-U-B-B-O, "B" as in boy.

15         **THE COURT:**  Thank you.  What is it that we're showing

16   on the -- there you go, okay.

17         **MR. LOPEZ:**  Yes, your Honor.

18                          **DIRECT EXAMINATION**

19   **BY MR. LOPEZ:**

20   Q    Agent Rubbo, can you please state your full name for

21   purposes of the record?

22   A    Vincent Paul Rubbo.

23   Q    And, Agent Rubbo, who are you currently employed by?

24   A    Currently employed at the Bureau of Alcohol, Tobacco,

25   Firearms, and Explosives.

Rubbo - Direct / By Mr. Lopez                                    8

1   Q    And what's your position within ATF?

2   A    I'm a special agent with the ATF.

3   Q    And how long have you been a special agent with ATF?

4   A    I've been a special agent with ATF since January, 2015

5   (indiscernible)

6   Q    Prior to --

7   A    -- and a half years.

8   Q    Prior to serving as a special agent for ATF, were you

9   involved in any other military or law enforcement positions?

10  A    Yes, I was involved in corporate security positions,

11  security director positions, as well as an officer in the

12  United States Marine Corp.

13  Q    Okay.  As a special agent for ATF, were you involved in

14  investigation relating to Jesus Murillo and various other straw

15  purchasers?

16  A    I was not directly involved in an investigation with

17  Murillo, but ATF agents, especially in ATF group three, Agent

18  Cesar Zambrano was, as well as another agent in our office,

19  Special Agent Dave Weiss (phonetic).  There's two different

20  investigations with Murillo.

21  Q    Did the -- and I'll get to that here in a bit.  I'd like

22  to talk to you about how this case initiated or how these cases

23  initiated relating to Jesus Murillo.  And if I could draw your

24  attention to a graphic that's in place here, using this graphic

25  can you explain to the Court how ATF's investigation or

1   investigations led to Jesus Murillo?

2   A      Absolutely.  I'll start with the -- basically in the top

3   left, you have --

4            **MR. BALLESTEROS:**  Judge, --

5            **THE COURT:**  Just a second.

6            **MR. BALLESTEROS:**  If I may, Judge, may I have

7   Mr. Murillo either come sit with me or if I can go over there

8   and just be with my client in case --

9            **THE COURT:**  Whichever is actually most convenient.

10  And if any other defense counsel wants their client next to

11  them, whichever is most convenient for you, I think it might be

12  easier to have the -- if you want -- have all your paperwork

13  there to have your client sitting next to you then --

14           **MR. BALLESTEROS:**  I can go over there.

15           **THE COURT:**  Okay.

16           **MR. BALLESTEROS:**  I think it's a better view of --

17           **THE COURT:**  Okay.

18           **MR. BALLESTEROS:**  -- the presentation, if I may.

19           **MS. GUTIERREZ:**  I'd like to (indiscernible)

20           **THE COURT:**  Any -- yes, any one of defense counsel

21  can do that or bring their client to the table.

22           **MR. ROMERO:**  May I have Mr. Hernandez (indiscernible)

23           **THE COURT:**  Yes.  Mr. Garcia, if you want, he can

24  pull around on your side or whatever works best for you because

25  I know it's hard to -- all -- or you can put that monitor on

Rubbo - Direct / By Mr. Lopez                          10

1    the other way around, sit next to him.  Whatever --

2         **MR. GARCIA:**  Okay.

3         **THE COURT:**  Flip the one monitor towards you and

4    Mr. Romero can have the other monitor towards him.

5         **MR. ROMERO:**  I'm fine, your Honor.

6         **THE COURT:**  Okay, all right.  Okay, I think we can

7    continue.

8    **BY MR. LOPEZ:**

9    Q    So, Agent Rubbo, can you explain to the Court how ATF's

10   investigation or investigations led to Mr. Murillo?

11   A    Yeah, so it's basically a culmination of three separate

12   ATF investigations.  One investigation was with Carlos Zamudio,

13   this investigation include straw purchases and firearms

14   trafficking.  As you can see in the hierarchy that Carlos

15   Zamudio was arrested by ATF for straw purchasing and

16   trafficking firearms into Mexico.  He was purchasing firearms

17   not for himself but for another individual named Lizandro

18   Salvador Morales.  ATF also had an investigation with a Jesus

19   Murillo, one of the codefendants here.  This investigation

20   started out as a -- based on 18 USC 922(n) where Murillo was

21   under indictment for a separate crime while in possession of

22   firearms.  And then there was my investigation which started

23   with a lot of multiple sales of long guns or AK47-type firearms

24   from several individuals here and several individuals who are

25   not on this presentation that purchased multiple AK47-type

Rubbo - Direct / By Mr. Lopez                               11

1   firearms within a very short period -- short timeframe, which

2   led me to start an investigation into the straw purchasing of

3   these firearms, which makes -- mostly centered around Miguel

4   Cervantes, Rene Hernandez, Mario Garcia, and Felix Hernandez.

5   Q    Now, at the inception of these three ATF cases, were ATF

6   agents aware of the link between the three cases at their

7   inception?

8   A    Not at the beginning, but as we progressed through and

9   then started de-conflicting with each other, we were -- we did

10  become aware of who was associated with which individual and

11  who was buying presumably for several different individuals.

12  Q    Okay.  Now, you mentioned Mr. Zamudio, and I just want

13  this to be clear on the record, had purchased for an individual

14  with the last name Morales-Medrano.  After Mr. Morales-Medrano

15  was arrested, did Mr. Zamudio continue buying for another

16  individual?

17  A    Yes, it was -- he stated that he was buying -- after

18  Morales-Medrano, also known as "Chava," was arrested, he stated

19  he purchased firearms for another individual, basically his

20  brother.

21  Q    And --

22          **THE COURT:**  Who's brother, Morales's brother or --

23          **MR. LOPEZ:**  Yes, your Honor.

24          **THE COURT:**  Okay.

25  //

1    **BY MR. LOPEZ:**

2    Q    And was that individual also an individual or were these

3    other individuals that Mr. Zamudio purchased for after the

4    arrest of Mr. Morales-Medrano also some of the individuals that

5    Mr. Murillo was purchasing for?

6    A    Yes (indiscernible)

7    Q    Now, agent, I want to draw your attention to various of

8    these individuals and their specific roles within this scheme.

9    And I'd like to go ahead and start off with Miguel Cervantes,

10   Junior.  What can you tell the Court regarding Mr. Cervantes,

11   Junior and his role within this scheme?

12   A    With Miguel Cervantes, we -- me and another agent first

13   approached Miguel Cervantes at the residence of the Hernandez

14   brothers.  From there we conducted a couple different

15   interviews with Miguel in which he told ATF agents that he was

16   an avid marijuana smoker.  He did come up with a story of how

17   he purchased kind of six firearms on one day and then came back

18   and purchased another two firearms the next day.  There was

19   kind of a story where he said that these firearms were stolen,

20   that he lost these firearms, but Cervantes ended up basically

21   just coming clean with ATF agents, admitted that he did wrong

22   and he basically apologized for it, and telling us that he

23   bought these firearms, approximately eight firearms, seven of

24   which I was able to identify through ATF Form 4473's, for other

25   individuals, specifically for Jesus Murillo.

 1  Q    And --

 2            THE COURT:  Let me interrupt you just for a second

 3  there.  You said seven you could identify.  As to the eighth,

 4  were you able to get any other information other than him

 5  saying he had purchased eight?

 6            THE WITNESS:  Your Honor, I checked several different

 7  FFLs in the area, the Rio Grande Valley, and I was not able to

 8  come up with that.

 9            THE COURT:  With the eighth.

10            THE WITNESS:  No.

11            THE COURT:  And did he ever give you any more

12  information about to where the eighth one was purchased?

13            THE WITNESS:  He gave -- he did give me some

14  information of which FFLs that he went to, and from that

15  information and what I already had through multiple sales

16  reporting, through 4473s from FFLs, I was able to verify that

17  as to exactly which FFLs he was telling me he went to, which

18  was accurate, but I could not --

19            THE COURT:  But you only identified seven.

20            THE WITNESS:  There's -- yes, yes, your Honor.

21            THE COURT:  Okay.

22            THE WITNESS:  Either for whatever reason I could not

23  find it or that 4473 was not produced for the other firearm.

24            THE COURT:  All right, thank you.

25  //

1  **BY MR. LOPEZ:**

2  Q    And, Agent Rubbo, later on I'll talk to you a little bit

3  in more detail regarding these 4473's.  But in relation to the

4  firearms purchased by Mr. Cervantes, did Mr. Cervantes indicate

5  to you whether he knew where these firearms were eventually

6  destined to go to?

7  A    Yes, he stated that he knew because he was riding around

8  with Murillo and Rene Hernandez to go purchase these firearms.

9  On one of the occasions where he was picked up and transported

10  in Murillo's vehicle, Murillo stated to both him and Rene that

11  these vehicles were destined for Mexico.

12            **THE COURT:**  The vehicles or the firearms?

13            **MR. LOPEZ:**  The --

14            **THE WITNESS:**  The firearms were destined.

15            **THE COURT:**  Okay.

16  A    These firearms were destined to Mexico and that they were

17  going to be scratched off -- the serial numbers would be

18  scratched off or obliterated so that they wouldn't have to

19  worry about races coming back.

20  Q    And I'll talk to you more in detail regarding in generally

21  speaking what those obliterated serial numbers do for your

22  investigation later.  But in relation to Mr. Cervantes's role

23  in this scheme, how much was he to be paid based on your

24  investigation for each firearm purchased?

25  A    If I believe correctly, it was -- Miguel was paid

Rubbo - Direct / By Mr. Lopez                          15

1    approximately $150 per rifle.

2    Q    Okay.  After Miguel made his purchase -- or Mr. Cervantes

3    made his purchases, were you given any other information as to

4    any attempts by Mr. Cervantes to recruit other individuals to

5    also purchase firearms for this conspiracy?

6    A    Yes.  At the time, Miguel stated that another individual

7    not present was recruited and that recruitment came -- took

8    place at the mall.  Miguel Cervantes was with another friend at

9    a mall where he was approached by Rene Hernandez.  Rene

10   Hernandez ended up coming up with this scheme, telling him how

11   easy it is to purchase firearms, to make money off of it.  And

12   while Miguel and his friend were at the mall, they listened to

13   Rene and unfortunately carried through and went through with

14   the purchase of the firearms.

15          In a separate kind of interview with Murillo, Murillo

16   stated that Cervantes, --

17   Q    (Indiscernible)

18   A    -- he did have four to five other friends that were

19   helping him out --

20   Q    And --

21   A    -- in that scheme.

22   Q    And let's go ahead and pause here because we will get to

23   Murillo eventually.  But how many of these rifles that were

24   purchased by Mr. Cervantes are we aware of that have been

25   recovered --

1          THE COURT:  Let me interrupt you before you get to

2    that question so I can clarify something you just said.  Did

3    Mr. Cervantes himself say that he had recruited four or five

4    others or --

5          THE WITNESS:  No, he did not.  This is --

6          THE COURT:  -- what was the understanding of what --

7          THE WITNESS:  Jesus Murillo stated that --

8          THE COURT:  Was it Hernandez that approached -- oh,

9    okay.

10          THE WITNESS:  Jesus Murillo stated that Cervantes

11    recruited four to five of his friends.

12          THE COURT:  Okay, okay.

13    BY MR. LOPEZ:

14    Q    But nonetheless, agent, did Mr. Cervantes at least admit

15    to recruiting an individual for purchases in this conspiracy?

16    A    Yes, kind of conspired with another individual, Alexander

17    Cardenas, which led to the purchase of three additional

18    firearms.

19    Q    Okay, and how many of the rifles that were purchased by

20    Mr. Cervantes have been recovered in Mexico that we are aware

21    of?

22    A    To this date I am aware of four of those firearms that

23    have been recovered in Mexico, specifically Reynosa, Mexico.

24    Q    And you mentioned firearms that you're aware of.  Now, if

25    a firearm is recovered in Mexico and that firearm has an

1    obliterated or altered serial number, are you going to be made

2    aware of that firearm being recovered?

3    A    No.  At that point the law enforcement authorities in

4    Reynosa or Mexico would not have a serial number or identifier

5    to go off of to trace that back to a 4473 or to the original

6    purchaser.

7    Q    And did Mr. Cervantes make any statements as to whether he

8    believed that these firearms, when exported, would have altered

9    or obliterated serial numbers?

10   A    Yes, as I said before, while riding around with Jesus

11   Murillo, Murillo stated that these firearms would have their

12   serial numbers obliterated.  Obviously not saying -- using the

13   word "obliterated," but saying that these -- the numbers would

14   be scratched off.

15   Q    Okay.  Now, if we can go ahead and move on to Marella

16   Sandoval who I believe is kind of the next step in your

17   investigation related to these straw purchasers, what can you

18   tell us about Ms. Sandoval?

19   A    Yeah, at the same time while I was going through different

20   suspected straw purchasers at the time, other ATF agents came

21   across Marella Sandoval's purchasing three AK47-type rifles

22   during the -- ATF agents brought her into the office for a

23   noncustodial interview.  At that point, Sandoval -- actually

24   she had two interviews.  On the first interview, she didn't

25   basically tell us the complete truthful story of what happened.

Rubbo - Direct / By Mr. Lopez                              18

1    She also had a fake bill of sale that was presented to ATF

2    agents for these firearms.

3    Q    Can you explain to the Court what exactly is a bill of

4    sale or what was it that she presented?

5    A    She basically presented a receipt that -- handwritten

6    receipt that would say that, hey, there was another buyer, that

7    she sold these firearms to another individual, which we found

8    out which was not true.  Marella Sandoval ended up telling us

9    that Jesus Murillo and Pedro -- another individual named Pedro

10   Ruiz came up with a scheme or the idea to present a fake bill

11   of sale or even go through and file a false police report for

12   the stolen firearms.  In the end, Murillo and Ruiz had

13   convinced her to provide a bill of sale to the ATF agents.

14   Q    Okay.  And I just want it to be clear here, after

15   Ms. Sandoval made the statements to ATF agents initially

16   regarding the fake bill of sale, did she voluntarily call ATF

17   to explain the true story?

18   A    Yeah, after the incident, Ms. Sandoval called ATF agent

19   back, ATF Agent Wodesky (phonetic), and feeling bad about what

20   happened and not telling the truth.  She offered to voluntarily

21   come back in and explain the truth to the agents.

22   Q    Okay.  And I know you mentioned an individual by the name

23   of Pedro Ruiz.  I don't want to go into too much detail

24   regarding this, but have we -- have ATF agents been given --

25   during these courses of these interviews with these various

1  defendants, have they been given conflicting information

2  regarding the role and involvement of Mr. Pedro Ruiz?

3  A    Yes.  A couple of cooperators here ended up giving

4  conflicting statements as to who provided the money, who

5  traveled with Marella Sandoval, who received the firearms, and

6  how much they were paid for the firearms.

7  Q    Okay.  Nonetheless, one thing that has stayed true

8  regarding Ms. Sandoval's purchases is the involvement of

9  Mr. Murillo; is that correct?

10 A    Yes.  Throughout each interview and proffer, the same

11 story remains the same, that three AK-47's were purchased for

12 Murillo, cash was provided by Murillo to Sandoval at the time -

13 - before the time of purchase, knowing that these firearms were

14 going directly to Murillo after the purchase.

15 Q    Moving on to Mr. Felix Hernandez, what can you tell us

16 about Mr. Felix Hernandez?

17 A    Felix Hernandez is another basically individual that we

18 had on multiple sales.  We had 15 firearms, 13 long guns, 13

19 AK-47 firearms, and two handguns that I was able to provide or

20 have the ATF Form 4473's for the purchase signed by Felix

21 Hernandez.  Through statements of other cooperators and

22 individuals, we knew that Felix Hernandez was also involved

23 with these individuals in recruiting other individuals to

24 purchase firearms.  It's believed that Roberto Laza (phonetic),

25 who's not a part of this presentation, was another one of those

1    individuals.  We also know that Felix Hernandez, through

2    statements made by other cooperators and other statements made

3    under proffer, that Felix Hernandez was involved not only with

4    just purchasing firearms, but also with associating or making

5    the connection, introduction of Jesus Murillo with a -- with

6    Carlos Zamudio.  So you have kind of one investigation linking

7    into -- with Jesus Murillo linking into Carlos Zamudio.

8    Q     Okay.

9    A     And that's where you have statements made where Felix

10   Hernandez had asked Carlos Zamudio to take a bag of

11   approximately 30 firearms to Jesus Murillo.  Zamudio stated

12   that he did take a bag of approximately 30 firearms to Murillo.

13   Also, statements were made that --

14            THE COURT:  I'm sorry, Zamudio took them to Murillo?

15            THE WITNESS:  Yes, your Honor.

16            THE COURT:  Okay.

17   A     And from Zamudio's testimony, it was believed that these

18   firearms were going not to Lizandro Morales but his brother,

19   "Diablo," Luis (phonetic) Morales, who was identified as

20   Fanulanu (phonetic) on the slide.

21   Q     Now, agent, I want one thing to be clear on the record

22   regarding this back of 30 firearms.  Were we given any sort of

23   identifying features regarding the firearms in the bag such

24   that ATF would be able to trace them?

25   A     No, no identifying features.  We didn't have description

1  of what exactly firearms were in it, what any firearms with

2  serial numbers.  The only information that was received was

3  that Miguel Cervantes provided -- or purchased five AK-47's for

4  Murillo, and five -- those five AK-47's were part of this

5  delivery.

6  Q    Okay, so five of the guns that were purchased by

7  Mr. Cervantes were believed to be within this bag of 30

8  firearms.

9  A    Yes.

10  Q    Now, what can you tell us about the relationship between

11  Mr. Hernandez and Mr. Zamudio regarding a social or even do

12  they use drugs together based on information that you gathered?

13  A    Yes.  Statements made by cooperators that it was often

14  enough that Zamudio or Murillo were with -- typically with

15  Felix Hernandez, Rene Hernandez, and Miguel Cervantes as

16  smoking marijuana either at the residence of the Hernandez or

17  close by down the street to another individual named Alberto

18  Lanu (phonetic).  There's also statements made that there was

19  also drug transactions taking place at the Hernandezes'

20  residence, specifically Rene and Felix selling marijuana out of

21  the house.

22  Q    Okay.  Now, going back to the firearms actually purchased

23  by Mr. Felix Hernandez, how many ATF Form 4473's with these

24  misrepresentations were found relating to Mr. Hernandez?

25  A    For Felix Hernandez --

1  Q    Felix Hernandez.

2  A    Yes, Felix, there was 15, 13 AK47-type firearms, typical

3  firearms that associated with drug trafficking organizations,

4  cartels.

5  Q    And this is one part that I do want to make clear to the

6  Court and to counsel, can we -- currently, is ATF able to

7  segregate which of those 15 firearms were destined to be

8  purchased for Zamudio and which of those 15 firearms were

9  destined to be purchased for Murillo?

10  A    Unfortunately I cannot due to Carlos Zamudio, Jesus

11  Murillo, Mariano Garcia, Felix/Rene Hernandez, and Miguel --

12  actually not Miguel Cervantes, but those individuals were

13  driving around to separate different FFLs, either on the same

14  day or different days or day after, and purchasing kind of at

15  the same time.  So it's kind of hard to tell exactly who's

16  firearms were going to either Zamudio or Murillo.  But through

17  the investigation and through statements made, it's -- you can

18  -- for me it's kind of easy to tell that Zamudio and Murillo

19  were kind of working kind of as partners to recruit these

20  individuals and get them to other individuals --

21  Q    Okay.

22  A    -- kind of higher up the hierarchy.

23  Q    And nonetheless, we do know that regardless of whether

24  it's 14 and one or one and 14 or whatever the combination is,

25  at least one of these firearms was purchased by Mr. Felix

Rubbo - Direct / By Mr. Lopez                           23

1    Hernandez for Zamudio, and at least one of those was purchased

2    for Mr. Jesus Murillo specifically.

3    A    Yes.

4    Q    Moving on to Mr. Rene Hernandez, what did ATF agents learn

5    during the course of the investigation regarding Mr. Rene

6    Hernandez?

7    A    ATF learned that Rene Hernandez had a significant role in

8    recruiting Miguel Cervantes.  Those two being close friends and

9    with all of them kind of living in the neighborhood, it's kind

10   of easy to see each other or even bump into each other at the

11   mall or somewhere else --

12   Q    And you mentioned all of these -- and I apologize for --

13   A    That's okay.

14   Q    -- cutting you off.  You mentioned all these individuals

15   living close in the neighborhood, I realized I didn't speak

16   about it earlier.  Is there a familial relationship between

17   Mr. Rene Hernandez and Mr. Felix Hernandez?

18   A    Yes, there is because I believe they share the -- went to

19   the same school, kind of grew up in the same neighborhood --

20             **THE COURT:**  I'm sorry, Felix and Rene Hernandez.

21             **MR. LOPEZ:**  Yes.

22             **THE WITNESS:**  Yes.  And that these -- the brothers --

23             **THE COURT:**  They're brothers, okay.

24             **MR. LOPEZ:**  Yes, and that's what I was getting at.

25   A    They're brothers.  And then, you know, at the very start

Rubbo - Direct / By Mr. Lopez                                    24

1    of my investigation, there was a link through social media

2    through all these individuals as being friends with each other,

3    associated with each other, posting on their timelines and, you

4    know, going to Nikki Rowe High School together.  So you could

5    kind of (indiscernible) --

6    Q    Did a lot of these --

7    A    -- them together as going -- the same group here is going

8    out and purchasing one, two, three, or four firearms at a time.

9    Q    With the exception of Ms. Sandoval, were a lot of these

10   individuals even living in the same neighborhood roughly?

11   A    Yes, they were.

12   Q    Now, what can you tell us about the firearm purchases made

13   by Mr. Hernandez?

14   A    Rene Hernandez purchased eight firearms with corresponding

15   ATF 4473's for these firearms.  We know that these firearms

16   were going to Jesus Murillo because Miguel Cervantes was with

17   Rene Hernandez and Murillo.  In fact, Murillo would meet

18   Cervantes on the corner of the street, pick him up.  Rene

19   Hernandez would already be there with them, and these three

20   individuals would go to the FFLs --

21         THE COURT:  So you're saying the ones purchased by

22   Rene Hernandez were going to Murillo and not Zamarillo (sic)?

23         THE WITNESS:  They -- all of Miguel Cervantes's

24   firearms were going to Jesus Murillo and --

25         THE COURT:  Okay, what about Rene Hernandez.

1        **THE WITNESS:**  And Rene Hernandez being with

2   Cervantes, we knew that those two, that it was Rene and

3   Cervantes together purchasing firearms for Murillo.

4        **THE COURT:**  For Murillo.

5        **THE WITNESS:**  Yeah.

6        So basically it was Rene Hernandez who would

7   coordinate with Miguel Cervantes, have him picked up around the

8   corner, go with Murillo; Murillo would take both individuals to

9   the FFLs to purchase AK-47's for him.

10  **BY MR. LOPEZ:**

11  Q    And when -- and just so the record is clear, when you say

12  "FFL," you're talking about Federal Firearms Licensees,

13  correct?

14  A    That's correct.

15  Q    And when these individuals are being taken to the FFLs,

16  during the course of your investigation and looking at receipts

17  for sales and purchases, were you able to find sales and

18  purchases made at or near the same time between the group that

19  was traveling with Murillo, specifically Murillo, Rene, and

20  Miguel, and also Felix and/or Mariano?

21  A    Yes, you could tell.  Going through the ATF 4473's, the

22  date that they were purchased, and even if they had a timestamp

23  or if they had a NICs (phonetic) kind of background check on

24  it, you could see that they -- these purchases were made within

25  a very close timeframe, if not the same time, with all these

1    individuals involved.  And that's including Mariano Garcia,

2    Felix Hernandez, Rene Hernandez, and Miguel Cervantes.

3    Q    So in other words, even though in one vehicle you had

4    Mr. Murillo, Mr. Hernandez, and Mr. Cervantes, based on looking

5    at the receipts and the transactions, a lot of times you would

6    see either Mr. Mariano Garcia or Felix Hernandez purchasing

7    firearms from the same FFL on the same date, sometimes even

8    within minutes of each other.

9    A    That is correct.

10   Q    Okay.  Now, I don't want to get into too much of the

11   details, but after an arrest warrant was secured for

12   Mr. Hernandez, were agents able to locate Mr. Hernandez in the

13   Valley?

14   A    No, we were not.  We attempted to execute arrest warrant

15   at the known, suspected residence of Rene and Felix Hernandez

16   off of Kendlewood Avenue here in McAllen.  They were not

17   present at the time.  After that, --

18   Q    Did --

19   A    -- I later ascertained that they --

20   Q    Did -- before going into that, did you receive any

21   cooperation at the residence regarding the location of Mr. Rene

22   Hernandez and Mr. Felix Hernandez?

23   A    We spoke with -- I personally spoke with the mother of

24   Felix and Rene Hernandez who gave no cooperation as to their

25   whereabouts, cellphone number, what they were doing, and who

1   they were with.

2   Q    Okay, so how did it ultimately come to be that agents

3   found Mr. Rene Hernandez?

4   A    Ultimately ascertained that Rene and Felix Hernandez were

5   working in Corpus Christi.  I contacted an ATF agent in Corpus

6   Christi to -- for -- to look out for both Rene and Felix

7   Hernandez.

8   Q    At the time you contacted Corpus Christi, were you given

9   any information regarding other law enforcement agencies also

10  on the lookout for Mr. Rene Hernandez?

11  A    Yeah, when I spoke with the ATF Agent Juanito Hernandez

12  (phonetic), he spoke with Corpus Christi Police Department.  He

13  gave the information for both Rene and Felix Hernandez.  Corpus

14  Christi Police Department was very familiar with Rene

15  Hernandez.  They said they were familiar with him because they

16  were under a investigation for indecent exposure with several

17  females within the Corpus Christi area, even within the

18  neighborhood of an ATF agent.  These individuals identified

19  Rene Hernandez through these victims or the female statements

20  made, physical characteristics, as well as a license plate of

21  the vehicle he was driving.

22  Q    So based on the information that Corpus Christi PD had as

23  pertinent to their investigation, were ATF agents able to

24  subsequently find Mr. Rene Hernandez?

25  A    Yes, based on that information in identifying, knowing

Rubbo - Direct / By Mr. Lopez                    28

1    exactly who Rene Hernandez was and what he was suspected of,

2    they were able to identify him at a residence and which was

3    believed to be a family member of both Rene and Felix

4    Hernandez.

5    Q    Okay.  Now moving on to the last defendant that's

6    scheduled for sentencing here today, Mr. Jesus Murillo, what

7    can you tell us about Mr. Jesus Murillo?

8    A    Jesus Murillo was initially under ATF investigation for

9    being in possession of firearms while under indictment.

10   Mr. Murillo was under indictment for a separate nonrelated drug

11   trafficking offense which included trafficking approximately 55

12   kilos of cocaine in north -- well, north of here.  I think it

13   was like Fort Bend, Texas.  ATF agents started investigating

14   him for a vehicle accident which Murillo had four firearms

15   present in his vehicle.  ATF agents then followed up with

16   interviews with Murillo and also interviews with a FFL owner

17   who stated that Murillo and Pedro Ruiz attended a concealed

18   handgun carry license class at his place of business where

19   Murillo had rented a firearm there.

20   Q    At that point in time of the accident and the CHL class

21   that was being taken by Mr. Murillo, was he then already under

22   felony indictment out of Fort Bend County for the 55 kilograms

23   of cocaine?

24   A    Yes, he was.

25   Q    Okay.  What else was learned about Mr. Murillo's role

1  within this hierarchy organization?

2  A    Right about the same time that I was interviewing with

3  Cervantes, ATF agents were also interviewing with Sandoval.

4  Sandoval positively identified Murillo as the individual that

5  these firearms were being trafficked to, as well as Cervantes

6  identified Murillo as the same individual that he had -- he and

7  Rene had purchased firearms for.  With that information we were

8  able to ascertain that our investigations were linked between

9  Murillo acquiring these firearms and those firearms that were

10 found in his vehicle.  In a -- I believe it was a noncustodial

11 interview with Murillo, he stated that he received these

12 firearms from a gun show and gave agents specific amounts how

13 much he paid for these firearms, knowing that he was under

14 indictment, basically telling us that he was possessing

15 firearms or went to this CHL class to rent a firearm as well.

16 Q    The firearms that were found in the vehicle that had the

17 accident involving Murillo, what kind of firearms generally

18 speaking are they?

19 A    These -- there's basically two AK47-type rifles, typical

20 your AK-47 rifles that are smuggled or exported into Mexico for

21 drug trafficking organizations.  Also a .38 super and .380

22 caliber pistol.

23 Q    Are these -- are the weapons that were found in the

24 vehicle that Mr. Murillo had the accident in consistent with

25 the type of weapons that you see in your experience as the type

1    of weapons that are exported into Mexico illegally?

2    A     Every day.

3              THE COURT:  And when was that accident?

4              THE WITNESS:  Your -- I don't have the date.

5              MR. LOPEZ:  Your Honor, it's the date that's on Count

6    One of the indictment.

7              THE COURT:  Okay.

8    BY MR. LOPEZ:

9    Q     And before this -- or I guess let me backtrack here.  As

10   the investigations begin -- you begin to see the connections

11   between the investigations, both from the initial 922

12   investigation of Mr. Murillo for being a person in possession

13   of firearms while under indictment and your investigation of

14   these underlying straw purchasers, what begins -- what do you

15   begin to see is Mr. Murillo's role in the conspiracy?

16   A     We start to see that Murillo had a major role in

17   recruiting individuals, offered them or enticing them with

18   either a hundred and fifty to $300 per firearm to purchase

19   firearms for him.  Based on statements made by cooperators that

20   Murillo was working not only for himself to traffic firearms

21   into Mexico, but kind of working in tandem with the straw

22   purchasers and Carlos Zamudio to make sure that they were

23   getting paid their money to have these firearms trafficked into

24   Mexico in which they were getting anywhere around $1,500 per

25   rifle that they acquired from these individuals.

Rubbo - Direct / By Mr. Lopez                                    31

1   Q    So, all right, let me backtrack.  Are you aware of an

2   incident involving Mr. Murillo back in 2012 regarding alleged -

3   - an allegedly stolen vehicle?

4   A    Yes.  During a noncustodial interview of Murillo, I became

5   aware of Murillo being under investigation, an ATF

6   investigation, for straw purchasing.  In that interview, he

7   stated that he had made a written affidavit for the purchase.

8   He purchased nine firearms knowing that they were going to

9   Mexico for another individual.  Again, and then he admitted

10  that in the interview which was consistent with the statements

11  he made during that ATF investigation in 2012.

12  Q    Okay.  Nonetheless, the firearms that were purchased back

13  in 2012 and as during the course of your investigation, were

14  you given any sort of indication during your investigation into

15  Murillo that he knew where these firearms were headed?

16  A    Yes.  When we arrested Murillo, I can't tell which date it

17  was, but he had -- 2012 he had written affidavit where he

18  purchased nine firearms.  And then we have a vehicle

19  accident --

20          THE COURT:  Let me interrupt you there for just a

21  second.

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  That 2009 affidavit, that was in

24  connection with a charge that he was convicted of a false

25  report.  Is that --

1          THE WITNESS:  Yes, that is correct.

2          THE COURT:  -- in connection with that?  Okay.

3          THE WITNESS:  With I believe it was Mission PD, --

4          THE COURT:  Okay.

5          THE WITNESS:  -- a false report, false stolen vehicle

6   report.

7          THE COURT:  And as to those firearms, did you ever go

8   back and confirm the purchase of those firearms?

9          THE WITNESS:  I did not personally but --

10          THE COURT:  Did ATF?

11          THE WITNESS:  ATF did looking through the

12   investigation and knowing Zambrano, those firearms would have

13   corresponding 4473's and they had the serial numbers on them.

14   But I cannot confirm that they were, your Honor.

15          THE COURT:  Okay, but he admitted to having purchased

16   them.

17          THE WITNESS:  Yes.

18          THE COURT:  Okay.

19          THE WITNESS:  Yes, on several different occasions.

20          THE COURT:  Okay.

21   A    So you have kind of this history of Murillo either

22   purchasing firearms for other individuals or possessing

23   firearms.  And you had the charges in Fort Bend where he was

24   under indictment after the -- under -- after he was under

25   indictment.  He had the vehicle accident where four firearms

Rubbo - Direct / By Mr. Lopez                     33

1   were recovered, those two kind of AK47-type firearms and two

2   highly -- also highly trafficked pistols, a .38 super and .380

3   were in his possession.

4   Q    After the accident, does he continue to work with others

5   and recruit others to conduct straw purchasing activities?

6   A    Yes, he does.

7   Q    After recruiting others to conduct straw purchasing

8   activities and his subsequent warrant issued for his arrest, at

9   the time of his arrest is he still again found in possession of

10  firearms?

11  A    Yeah, when we finally got the arrest warrant for Murillo

12  in 2006 (indiscernible) November, 2016, ATF agents pulled

13  Murillo over in his vehicle, also found another -- a nine

14  millimeter STAR-manufactured firearm loaded with five rounds in

15  the center console this firearm.  And in a post-*Miranda*

16  custodial interview, he admitted that he had this firearm for

17  protection.

18  Q    Now, Agent Rubbo, I want to draw your attention to I guess

19  the fifth bullet point up here on the screen, the document and

20  involvement with the purchase of at least 27 firearms, and

21  bring your attention to the next screen.  In regards to Felix

22  Hernandez and Mariano Eberth Garcia, those two individuals were

23  purchasing both for Mr. Zamudio and Mr. Murillo; is that

24  correct?

25  A    That is correct, because based on statements we have is

1    that at times they would go out individually for Murillo or in

2    pairs, and then at times these individuals, Mariano, Miguel,

3    Rene, and Felix, would be out with Zamudio and Murillo

4    purchasing firearms for those two.

5    Q    And as to Felix Hernandez, we don't know how many he

6    purchased for Zamudio, we don't know how many he purchased for

7    Murillo; is that correct?

8    A    No, we don't because typically all you know is you go to a

9    gun shop and you purchase a gun and it's what gun did you

10   purchase, I purchased an AK.

11   Q    And as to Mariano, we don't know how many of those guns

12   were purchased for Zamudio.  We know some of the guns that were

13   purchased for Murillo in light of the timestamps on some of

14   these receipts, though; is that correct?

15   A    That's correct.

16   Q    We know that at least three of the guns that were

17   purchased by Mariano resulted in the transfer to Murillo; is

18   that correct?

19   A    That's correct.

20   Q    However, as to the remaining six, we don't know whether

21   those resulted in the transfer to Zamudio or to --

22   A    I do not know.

23   Q    Okay.  Now, up here for instance under Rene Hernandez, I

24   have, you know, eight slash seven.  Did Rene Hernandez purchase

25   eight firearms in connection with this conspiracy?

Rubbo - Direct / By Mr. Lopez                                    35

1    A    Yes, he did.

2    Q    And the other seven would be representative of those that

3    were purchased by Miguel, correct?

4    A    Miguel.

5    Q    So --

6    A    With Miguel Cervantes, also based on statements of him

7    being in the vehicle, knowing that these firearms were going to

8    be scratched off and go to Mexico.

9    Q    And what's not on this chart, I want to be clear, is there

10   were additional purchases that were also made by a Mr. Lesa

11   (phonetic) and Mr. Cardenas; is that correct?

12   A    Yes, there's two other individuals that I had a kind of

13   social media link basically through Facebook and through

14   statements made that these guys were friends or knew each other

15   that had also purchased three firearms per each individual.

16   Alex Cardenas, he's not here and I don't want to get in too

17   much into it, but he retained an attorney and no statements

18   were made.  And basically the same thing with Leza.

19   Q    Okay.  And generally speaking, this is the organizational

20   structure of this organization as this investigation has

21   determined it to be; is that correct?

22   A    Yes.

23          **MR. LOPEZ:**  Okay, your Honor, I have no further

24   questions for this witness.

25          **THE COURT:**  Okay, why don't we take it in the order

Rubbo - Cross / By Mr. Garcia                    36

1    in which the testimony was presented as to these Defendants,

2    beginning with Mr. Cervantes?

3              MR. GARCIA:  Okay, may I proceed, your Honor?

4              THE COURT:  You may.

5                        CROSS EXAMINATION

6    BY MR. GARCIA:

7    Q    Mr. Rubio (sic), how many weapons is Mr. Cervantes being

8    held accountable for?

9    A    Eight.

10   Q    Eight.  On the slide that was just removed, it said seven.

11   A    I think it had PSI, I think they reported that he had

12   eight based off of his statements, but what I know it's seven.

13   Q    And you have documentation for seven.

14   A    Documentation for seven.  So to answer your question, he's

15   accountable for seven firearms.

16   Q    Account for seven.

17   A    Yes.

18   Q    Okay, seven purchases?

19   A    Seven firearms, two different purchases, two different

20   dates of (indiscernible)

21   Q    Would you agree that possibly his recollection on how many

22   firearms he purchased was incorrect?

23   A    That's possible.

24   Q    And I believe there was a -- some statements that you made

25   about the -- you recovered four firearms; where did you recover

1   these firearms?

2   A    I believe those four firearms may have been with Murillo.

3   These four firearms were recovered in a McAllen PD

4   investigation involving the accident of Murillo.  And this --

5   these are separate, none of these guns were Cervantes's guns.

6   It's a totally separate incident where Murillo purchased

7   firearms which he stated that it was coming from a gun show

8   that he had purchased so --

9          **THE COURT:**  But I think maybe the question was about

10  that they were recovered in Mexico.  Is that --

11         **THE WITNESS:**  Okay.

12         **THE COURT:**  Mr. Garcia?

13         **MR. GARCIA:**  I was talking to my client when he

14  testified --

15         **THE WITNESS:**  Okay.

16         **MR. GARCIA:**  -- to that, your Honor, I didn't hear

17  what he -- where they were recovered.

18  A    Yes, so from all the traces, and ATF filled out traces for

19  every firearm, four of those traces, four firearms were traced

20  back in some kind of a crime-related incident in Mexico.

21  Q    And those were the ones that he, Mr. Cervantes, had

22  purchased.

23  A    Yes.

24  Q    And were the serial numbers still on these firearms?

25  A    These serial numbers still were, yes.

1  Q    They were still there.

2  A    And I don't mean to lead on or anything, even though that

3  they might not have been recovered yet doesn't mean that

4  they're -- they were scratched off or obliterated here.  Maybe

5  they are somewhere else or maybe in Mexico, maybe somewhere,

6  but they have not been recovered and reported through ATF or

7  through some kind of tracing system to us.

8  Q    I believe you testified that you believe that

9  Mr. Cervantes had recruited Alex Cardenas.

10 A    Yes, I did.

11 Q    And it -- but isn't it true that when Mr. Cervantes was

12 recruited, it occurred there at the mall with Mr. Cardenas

13 being there present as well?

14 A    Yes, it did.

15 Q    And that's where Mr. Rene Hernandez recruited both

16 Mr. Cervantes and Cardenas.

17 A    Yes, I believe that Rene Hernandez had -- was the main

18 individual who introduced the idea to these two individuals,

19 and it was Rene Hernandez that sold both Miguel and Alexander

20 Cardenas on this idea.

21 Q    And prior to this -- the purchase of these firearms,

22 Mr. Hernandez did know Mr. Cardenas and Mr. Cervantes as well.

23 A    Yes.

24 Q    Meaning that if he wanted to recruit Mr. Cardenas, he

25 didn't need to go through Mr. Cervantes; is that correct?

Rubbo - Cross / By Ms. Gutierrez                    39

1    A    I believe so.

2    Q    They were all from the same neighborhood.

3    A    Yeah, I believe so.

4         **MR. GARCIA:**  I have no further questions, your Honor.

5         **THE COURT:**  All right, thank you.  We'll move to

6    Ms. Sandoval then.

7         **MS. GUTIERREZ:**  Good morning, Mr. Rubbo.

8         **THE WITNESS:**  Good morning.

9                        **CROSS EXAMINATION**

10   BY MS. GUTIERREZ:

11   Q    I want to ask you some questions with respect to the

12   background checks that these FFLs perform in order to determine

13   whether an individual -- or they can sell a firearm to an

14   individual.  Is that what we -- is commonly known as a

15   background check?

16   A    Yes.

17   Q    Okay, and is that a Federal system or a State system?

18   A    That is a Federal system managed by the FBI.

19   Q    And what is the purpose of a background check, what is the

20   objective?

21   A    The objective is to make sure that prohibited individuals,

22   prohibited individuals from purchasing firearms are not allowed

23   to purchase those firearms.

24   Q    So in the event of some individual who has a felony

25   conviction who may not be able to purchase a firearm, is that

Rubbo - Cross / By Ms. Gutierrez                    40

1  background check supposed to catch that and prevent the sale of

2  a firearm to that individual?

3  A    I'm sorry, I didn't catch that.

4  Q    If there is an individual who has a felony conviction and

5  they try to purchase a firearm, is the background check

6  supposed to catch that and prevent the same from occurring?

7  A    Absolutely.

8  Q    Do you have any information that Marella Sandoval was --

9  that it was unlawful for her to have purchased the firearms she

10 purchased?

11 A    No.

12 Q    Are you familiar with the term "deferred adjudication?"

13 A    Yes.

14 Q    And is it your understanding that deferred adjudication

15 prevents an individual from receiving a conviction for their

16 offense if they complete whatever terms they're given?

17 A    Yes, that's --

18 Q    And so if a person successfully completes their term of

19 probation and they end up with no conviction at the end, would

20 that prevent them from purchasing the firearm?

21 A    No, it would not.

22     **(Pause)**

23 Q    You don't have any information that Ms. Sandoval recruited

24 anyone else; is that correct?

25 A    No, not at all.  She was actually -- she was the one being

1  recruited.

2  Q    And you made a statement with respect to the fact that you

3  believe there is no information to indicate that Marella

4  Sandoval had knowledge or reason to believe that the firearms

5  were destined for Mexico; is that an accurate statement?

6  A    I can't recall if she knew or she did not know, but she

7  knew that Ruiz and Murillo were not allowed to purchase

8  firearms.

9  Q    Is that --

10            THE COURT:  And what is your understanding of how she

11  knew that?

12            THE WITNESS:  Through -- she met with -- around the

13  time of the purchase of the three AK-47's, she had met with

14  Ruiz and Murillo.  Ruiz told her that he had already purchased

15  a -- Ruiz was not a prohibited person, but from my

16  understanding of the conversation with Marella was that Ruiz

17  stated to her that he already purchased some firearms and if he

18  would purchase some more, it'd kind of be suspicious.  She also

19  stated that Ruiz presented her an opportunity to make money.  I

20  know Marella was kind of having a down -- a hard time, and her

21  sister had some issues and she had some kind of monetary --

22  some issues so Ruiz presented her as an individual to purchase

23  for Murillo so that she could make some money.  And she knew

24  that Murillo kind of was involved in narcotics and that she

25  would be purchasing for him because Murillo could not purchase

1  those firearms.

2  **BY MS. GUTIERREZ:**

3  Q    Well, you made several statements.  The first one that is

4  interesting to me is that you stated that she knew that

5  Mr. Ruiz, Pedro Ruiz, was not allowed to purchase firearms.

6  That's not accurate; is that correct?

7  A    That's correct.

8  Q    Okay, so the only issue with Ruiz was that he had already

9  purchased several firearms and he did not want to look

10  suspicious; is that correct?

11  A    That's correct.

12  Q    That in and of itself does not prevent him from purchasing

13  more firearms, correct?

14  A    Absolutely not.

15  Q    And with respect to Murillo, how is it that Ms. Sandoval

16  knew that Murillo could not purchase firearms?

17  A    There's a history with Ruiz and Murillo, and I believe

18  that Marella knew that he was under indictment and that he

19  couldn't purchase any firearms.

20  Q    How do you have information or how did you get information

21  that Ms. Sandoval knew that Murillo was under indictment?

22  A    Through conversations with Murillo, said that he told

23  Sandoval that he couldn't purchase any firearms.

24  Q    Is that in any written report that you've prepared?

25  A    It may be in the proffers or debriefs and the ROIs that I

1   have.

2   Q    With respect to the question I initially asked you, you do

3   not have any information that tells you that Ms. Sandoval knew

4   that the firearms were destined for Mexico; is that correct?

5   A    That's correct.

6            **MS. GUTIERREZ:**  I have no further questions.

7            **THE COURT:**  All right, thank you.  Then let's move to

8   Felix Hernandez.

9            **MR. GARZA:**  May it please the Court, Judge?

10           **THE COURT:**  I'm sorry?

11           **MR. GARZA:**  May it please the Court?

12           **THE COURT:**  Yes, of course.

13                       **CROSS EXAMINATION**

14  **BY MR. GARZA:**

15  Q    Special Agent Rubbo, how is it that you were able to

16  determine or find out how Felix Hernandez was recruited, or do

17  you know who recruited him?

18  A    I know that Carlos Zamudio had made statements that he was

19  with Felix Hernandez, Rene Hernandez, and Garcia at the time of

20  firearms purchases; which firearms purchases I cannot recall

21  offhand.

22  Q    Okay, so you don't know today who actually recruited

23  Felix.

24  A    I can't say positively exactly who was recruiting him or

25  if he worked more for one than -- more for Zamudio or for

1   Murillo.

2   Q    You made a statement earlier about Zamudio and Murillo,

3   that they had -- that Felix had purchased weapons for both

4   individuals.  How is it that you came about that information?

5   A    Statements made by Zamudio under -- stating that he was

6   with him at the time of purchase, that he knew that Rene and

7   Felix Hernandez were not -- and Garcia not only purchased

8   firearms while he was present and these firearms were going to

9   him, but also that he had statements from these individuals

10  saying that they were getting paid $300 from Murillo to

11  purchase firearms for him as well.

12  Q    So Zamudio was saying that Murillo was paying them.

13  A    Yes.

14  Q    Did Zamudio ever say that he paid Felix?

15  A    Not that I recall.

16  Q    Initially when you started interviewing these individuals,

17  did you get a chance to interview Murillo also?

18  A    Yes, we did.

19  Q    Okay.  And initially when you started interviewing those

20  individuals, they kept going back and making a fake -- like one

21  of the instances, they made a fake statement to you all in

22  terms of a purchase; isn't that correct?

23  A    That is correct.

24  Q    Okay, initially when you were talking with these

25  individuals, you felt uncomfortable about their trustworthiness

1    or they were being candid with you; am I correct?

2            **MR. LOPEZ:**  Your Honor, if the record can be clear as

3    to who are these individuals in question?

4            **MR. GARZA:**  Your Honor, I'll clear it up.

5            **THE COURT:**  Okay.

6    **BY MR. GARZA:**

7    Q    We're talking about Zamudio.  Initially you felt

8    uncomfortable with -- because of the fake statements and the

9    statements they were making to you all; isn't that correct?

10   A    Well, that's -- that was Zamudio, but basically with

11   everybody involved.  It was kind of difficult to tell who was

12   purchasing for who through the investigation because very --

13   they had come forth with very limited information, or they

14   didn't know who exactly they were purchasing for, how many

15   firearms they purchased, or when they purchased them, or where

16   they purchased them at.

17   Q    But you were -- you did get some documentation from these

18   two individuals --

19           **THE COURT:**  Which two individuals?

20   Q    -- where they had made some fake statements.

21           **THE COURT:**  Which two individuals?

22           **MR. GARZA:**  I'm sorry, from Zamudio and from Murillo.

23   A    From -- there were inconsistent statements with Murillo.

24   I don't recall anything with Zamudio.

25   Q    Did Zamudio ever tell you that Felix purchased firearms

Rubbo - Cross / By Mr. Garza                          46

 1   for him?

 2   A     No, I didn't.

 3   Q     Okay.  Did Murillo tell you that he purchased firearms

 4   from him?

 5   A     Murillo stated that he didn't specifically state Felix

 6   Hernandez by name, but he identified him through photo lineups

 7   as individuals that he knew purchased.  He -- basically Murillo

 8   deflected and associated these individuals as friends of Miguel

 9   Cervantes.  And through that association, him stating that

10   there was these individuals, ID'ing them as individuals

11   purchasing firearms, that's how we knew they were purchasing

12   for Murillo.

13   Q     You testified earlier that the Hernandez brothers, and I'm

14   talking about Felix and Rene, they lived in the Kendlewood area

15   here close by.  Do you know if Murillo and Zamudio also lived

16   in that area?

17   A     Yes, they lived close by.  We're talking -- I don't know

18   the exact address but you're I think talking within a couple

19   miles, maybe a mile.

20   Q     That they lived in the area.

21   A     Yeah.

22   Q     Okay.  A mile could be not within the same neighborhood,

23   would I -- would you agree with me?

24   A     Yes, I agree with you on it.

25   Q     Did they live on Kendlewood also?

Rubbo - Cross / By Mr. Garza                    47

1   A    No, they did not; different streets.

2   Q    You testified earlier that Felix knew that these weapons

3   were going to Mexico because he would hang around and ride

4   around with these individuals.  Did somebody tell you this or

5   did you basically assume that just because of the fact they

6   were -- and I'm talking about Zamudio and Murillo, did they

7   tell you that --

8   A    I believe it was Zamudio that stated that they all knew --

9   and "they" being Mariano Garcia, Felix and Rene Hernandez knew

10  -- that these firearms were going to Mexico.  They were told

11  that they were going north -- going up north, they were taking

12  these firearms up north.  But then you also have statements

13  made by Zamudio saying that these individuals knew that -- you

14  know, they were -- they knew what they were getting into.  And

15  then also you have Murillo stating that these firearms were

16  destined to Mexico and the numbers would be scratched off.  And

17  he stated that to -- based on statements that were given to me,

18  that Rene and Miguel Cervantes were present at that time when

19  Murillo stated that.

20  Q    But isn't it correct they initially told them that those

21  weapons were going north; isn't that correct?

22  A    That is correct.

23  Q    Okay, and thereafter he changed his statement and he said,

24  no, that they knew they were going to be going to Mexico; isn't

25  that correct?

1    A    Yes.

2            MR. GARZA:  I'll pass the witness, Judge.

3            THE COURT:  Okay, we'll move then to Mr. Rene

4    Hernandez.

5            MR. ROMERO:  May I proceed, your Honor?

6            THE COURT:  You may.

7                        **CROSS EXAMINATION**

8    BY MR. ROMERO:

9    Q    Agent, is it true that Zamudio and Murillo were the

10   ringleaders of this conspiracy?

11   A    Yeah, that's accurate to say, yes.

12   Q    And were they ultimately responsible for paying all the

13   individuals that were below the chain here?

14   A    Yes, they were.

15           MR. ROMERO:  Could I -- your Honor, may I --

16           THE COURT:  The chart?

17           MR. ROMERO:  May I trouble the --

18           THE COURT:  The chart back up?

19           MR. ROMERO:  -- AUSA to put up the first PowerPoint,

20   the organizational PowerPoint?

21           MR. LOPEZ:  This one?

22           THE COURT:  Yeah.

23           MR. ROMERO:  Yes, please and thank you.

24           MR. LOPEZ:  Okay.

25   //

1   **BY MR. ROMERO:**

2   Q    So really and truly we have Mr. Zamudio and Mr. Murillo as

3   being the two top heads here, right?

4   A    Yes, sir.

5   Q    Now, under Rene Hernandez, you have eight slash seven

6   equals 15, right?  But you also stated during your testimony,

7   and correct me if I'm wrong, that Mr. Cervantes and

8   Mr. Hernandez would go often together and purchase these

9   weapons, and that these weapons would then end up with

10  Mr. Murillo.

11         **THE COURT:**  And just to clarify, we have two

12  Mr. Hernandezes so Mr. Cervantes and which Mr. Hernandez?

13         **MR. ROMERO:**  Rene Hernandez.

14         **THE COURT:**  All right.

15  **BY MR. ROMERO:**

16  Q    Do you see that?

17  A    Yes.

18  Q    Okay, so really and truly what we have here is a situation

19  where Rene Hernandez purchased eight weapons, not 15.

20  A    Yeah, Rene Hernandez only purchased eight.

21  Q    Okay.  But it looks like he purchased 15 if we see that

22  equal sign, right?

23  A    Yes, and I believe that was put there, the seven, because

24  he had the role in recruiting Miguel Cervantes.

25  Q    Well, and I was going to ask you about that because you

Rubbo - Cross / By Mr. Romero                                50

1    used the term "introduced," right?  And ultimately Mr. Murillo

2    was the person who selected the straw purchasers, wasn't he?

3    A    I wouldn't necessarily say that he selected them.  Anybody

4    that was associated or buying firearms for him could present

5    other individuals to buy --

6    Q    Okay, did Mr. Hernandez make any money by introducing

7    Mr. Cervantes to Mr. Murillo?

8    A    No, not that I know of.

9    Q    Was Mr. Hernandez paid on the gross amount of weapons that

10   were purchased or was he only paid on the weapons that he

11   purchased?

12   A    He was not paid anything.  Just to be clear, Murillo was

13   the one who Cervantes stated that Murillo was the one handling

14   the money.  He would always be the one handling the money,

15   paying Cervantes and Rene the cash before.  So from statements

16   made, Rene Hernandez did not give anybody money to purchase

17   firearms for him or for Murillo or for anybody else.

18   Q    And you mentioned that the initial meeting took place in

19   the mall.

20   A    Yeah, with -- the initial meeting was with Miguel

21   Cervantes and his friend who ended up bumping into Rene

22   Hernandez at the mall.

23   Q    How old is Mr. Cervantes, do you know?

24   A    I believe he was born in '95, about 22.

25   Q    That's now.  But at the time of this meeting he was

Rubbo - Cross / By Mr. Romero                    51

1   younger than that, right?

2   A    Yes.

3   Q    How about Mr. Hernandez, Rene Hernandez, how old is he?

4   A    About the same age.

5   Q    Okay, so they were all friends from the neighborhood.

6   A    Absolutely.

7   Q    And they bumped into each other at the mall.

8   A    Yes.

9   Q    Was Mr. Murillo there?

10  A    No, he was not.

11  Q    Who was responsible for exporting the weapons to Mexico?

12  A    Jesus Murillo and Carlos Zamudio were the main individuals

13  responsible for seeing that they were transported to Mexico.

14  Q    How did -- how were the weapons exported to Mexico?

15  A    I do not know exactly how they were.  We have statements

16  made by Murillo of individuals stashing firearms in a Tahoe, an

17  individual that he was dealing with kind of that he was

18  purchasing for or working with.

19  Q    Do you know of any involvement by Rene Hernandez in the

20  exporting of these weapons?

21  A    No

22  Q    Do you know if Mr. Rene Hernandez knows how they were

23  exported?

24  A    No.

25  Q    Do you know -- let's -- let me ask you this.  The four

1   weapons that you say were recovered in Mexico, which four

2   weapons were they?

3   A    If you have the Excel spreadsheet, I don't know if you

4   have that, privy to it or not, but it is -- I have a

5   spreadsheet that was part of the investigation that was made

6   and I could tell you --

7   Q    Okay.

8   A    -- from that.

9         **THE COURT:**  I can tell you on the PSR what page it

10  is.

11  **BY MR. ROMERO:**

12  Q    Well, let me ask you this, agent, and we can short-circuit

13  this line of questioning.  With regards to the four weapons,

14  you said that they have never actually been recovered, have

15  they?  They're not here in the United States.

16  A    I do not know where they're at right now.

17  Q    Okay.  How do we know that the four weapons that were

18  allegedly recovered in Mexico was -- were four weapons that

19  were purchased by Rene Hernandez?

20  A    Let me backtrack and let's see here.  If I'm correct, Rene

21  Hernandez had four firearms traced.

22  Q    I'm asking you the questions.

23  A    Okay, --

24  Q    Is it possible --

25  A    -- I don't believe Rene Hernandez had any firearms traced.

Rubbo - Cross / By Mr. Romero                    53

1          **THE COURT:**  I will tell you the -- according to the -

2  - oh, I'm sorry, that was Miguel Cervantes.  I'm looking at the

3  wrong one so -- according to the PSR, he had one traced and --

4          **THE WITNESS:**  One, okay.

5          **THE COURT:**  One traced, and according to the PSR,

6  we're looking at paragraph -- excuse me, page 13, paragraph 45,

7  it indicates it was a Century Arms AK63D.

8          **THE WITNESS:**  Your Honor, if I may on that firearm,

9  that one trace and you asked me if it was in Mexico, that one

10 firearm that belonged to Rene Hernandez was traced.  It wasn't

11 found in Mexico, it was found here, it was found by Carlos

12 Zamudio under his seat at the time of his arrest.

13 **BY MR. ROMERO:**

14 Q    So the one weapon that you can attribute to Mr. Hernandez

15 never went to Mexico.

16 A    That's correct.

17         **THE COURT:**  And that was the one when Mr. Zamudio was

18 arrested or --

19         **THE WITNESS:**  Yes, your Honor.

20         **THE COURT:**  Okay.

21         **MR. ROMERO:**  And finally I want to go over this last

22 -- the last part of the PowerPoint for Mr. Rene Hernandez; can

23 I see that?

24         **MR. LOPEZ:**  The last part of the PowerPoint?

25         **MR. ROMERO:**  Yeah, the PowerPoint for Mr. Rene

1    Hernandez.

2              **MR. LOPEZ:**  Oh, the bullets.

3              **MR. ROMERO:**  Yes.

4              **MR. LOPEZ:**  This.

5    **BY MR. ROMERO:**

6    Q    It says:  "The circumstances surrounding the arrest in

7    Corpus Christi."  Did you read Mr. Hernandez's PSI?

8    A    No, I didn't.

9    Q    Okay, because during your testimony you testified, agent,

10   and please correct me if I'm inconsistent or wrong about this,

11   you testified that the victims identified Mr. Hernandez and

12   that he was arrested for indecent exposure, right?

13   A    I did not say that he was arrested.  No, he was not.

14   Q    Okay.

15   A    He was only a suspect.

16   Q    But you said he was identified by the victims, right?

17   A    His description and information was provided to Corpus

18   Christi.  He was identified by a detective or investigator with

19   Corpus Christi Police Department.

20   Q    So you -- so if you did say that the victims identified

21   him, you misspoke.

22   A    I do not know if they identified him or not.  I don't know

23   the course of their investigation right now.  I don't know if

24   they were presented any photo lineups or anything Rene

25   Hernandez at this point.

Rubbo - Cross / By Mr. Romero                    55

1   Q    Because do you know the disposition of that investigation?

2   A    No, I do not.

3   Q    Okay.  Because under -- on page 24, paragraph 84, the

4   second sentence --

5            **MR. LOPEZ:**  Your Honor, he doesn't --

6   Q    -- or the third sentence --

7            **THE COURT:**  Mr. Romero, --

8            **MR. LOPEZ:**  This agent doesn't have access to the

9   PSR.

10           **THE COURT:**  Did he say he didn't read the PSR.  And

11  obviously I can read the PSR so I know what it says.

12           **MR. ROMERO:**  All right.

13           **THE COURT:**  And I have read the PSR.

14  **BY MR. ROMERO:**

15  Q    But in any event, did you know that the victims -- that

16  all charges were dropped because the victims could not

17  positively identify Mr. Hernandez?

18  A    I did not know that.

19           **MR. ROMERO:**  Okay, your Honor, I will pass the

20  witness.

21           **THE COURT:**  Okay, then moving on to Mr. Murillo,

22  please.

23           **MR. LOPEZ:**  Do you need any of these slides, Alex?

24           **MR. BALLESTEROS:**  If you could put the organization

25  chart (indiscernible) please.

1           **MR. LOPEZ:**  Okay.  This one?

2           **MR. BALLESTEROS:**  Yeah.  May I proceed, your Honor?

3           **THE COURT:**  You may.

4           **MR. BALLESTEROS:**  Good morning, Agent Rubbo.

5           **THE WITNESS:**  Good morning.

6                           **CROSS EXAMINATION**

7    **BY MR. BALLESTEROS:**

8    Q    Let me just start with the chart.  On Jesus Murillo, it

9    has a total number of 28 on the chart.  Can you count those

10   weapons?  Those are the weapons attributed to Mr. Murillo,

11   correct?

12   A    That is correct.

13   Q    Okay.  Can you explain to the Court and to myself how you

14   came up with that number?

15   A    I came up with that number from Miguel Cervantes stating

16   that he purchased directly for Murillo, that these -- knowing

17   that these guns were going directly to Murillo.  Miguel

18   Cervantes stated he was with Rene Hernandez at the time of the

19   purchase of these firearms, and that leads us to believe that

20   Rene Hernandez and Miguel Cervantes purchased firearms at the

21   same time for Murillo.  Marella Sandoval stated that she

22   purchased three firearms directly for Murillo.  So that gave us

23   25.  And then statements made from Zamudio and basically from

24   4473's linked at the time of the purchases, you could tell that

25   there was three additional firearms.

Rubbo - Cross / By Mr. Ballesteros                              57

1    Q     Which three?

2    A     Three, I could not tell you which exactly, which three at

3    this time, no.

4    Q     And, Agent Rubbo, that's part of the difficulty of your

5    limited investigative tools that you have to try to determine

6    who these weapons belong to, right?

7    A     That is correct.

8    Q     Okay.  And I can come up with that number 28 a whole

9    different way just by looking at this chart, right?

10   A     Yes.

11   Q     Okay, and just on the math part, those 15 to Rene

12   Hernandez, those already include the seven from Miguel

13   Cervantes, right?

14   A     Yes.

15   Q     So 15 plus three for Marella Sandoval, that's 18, right?

16   Not 25.  And then the five that Mr. Murillo had, four of which

17   he had at the time of his accident back in 2014, I believe.

18   And then the one that he was in possession of when he was

19   arrested on this offense, I believe that's 23 total.

20   A     Right.

21   Q     Eighteen plus five, 23.

22   A     Right, and then -- yeah, and that doesn't include the nine

23   that he purchased in the straw purchase, and then he also

24   stated he had 25 firearms that he --

25   Q     But that --

Rubbo - Cross / By Mr. Ballesteros                    58

1    A    -- gave to another individual.

2    Q    And, Agent Rubbo, that is 23, right?

3    A    Yes.

4    Q    Okay, and these nine that you're referring to, those are

5    the nine from 2012 which have never been traced, have never

6    been recovered, no one knows where they're at, they were as

7    part of the statement that he made in a false report, right?

8    A    Yes, I believe so.

9    Q    Okay, and then you mentioned some other ones before I cut

10   you off.  What were the other ones?

11   A    So you had the -- and then you have statements made that

12   the -- another individual received 25 firearms from Murillo.

13   Q    Thirty firearms, right?  That was the package from

14   Zamudio.  And those weapons, we don't know where they're at.

15   A    Right.

16   Q    Or how they got there.  And all that number of that bag of

17   30 weapons, that came from one of the cooperating sources.

18   A    That's correct.

19   Q    And all the cooperating sources in this case have given

20   you or other ATF agents or law enforcement inconsistent

21   statements.

22   A    Only two -- well, actually multiple cooperators --

23   Q    Every single one in fact, right?  Every single cooperating

24   source or individual that's given you information on these

25   statements that you're getting, you're coming up with the

1  numbers from, they've all given you inconsistent statements,

2  correct?

3  A     Looking back, yes, yes.

4  Q     Okay, right.  And it's important to note that the

5  investigation for Mr. Murillo, it initiated from McAllen PD

6  because he was involved in an accident and he had weapons in

7  his possession, four weapons, and that led -- that McAllen PD

8  sent ATF a notice saying, hey, this is an individual who's

9  under indictment and he has weapons on him, correct?

10  A     Yes.

11  Q     That's where the investigation started.

12  A     That's where one investigation started with him.  As -- my

13  investigation was mostly from the bottom up.  You had -- you're

14  talking about while under indictment, that's another special --

15  ATF Special Agent Dave Weiss, he was investigating that at the

16  same time.  And then we had two other agents basically just

17  doing an interview of Sandoval, linked him into another --

18  basically the straw purchasing ring.

19  Q     Right.

20  A     So --

21  Q     But that's sort of where that came about.  It didn't lead

22  anywhere, he was under indictment, he had four weapons on him.

23  At that time, you indicated that these are weapons -- from

24  being asked by the prosecutor, you indicated that these are

25  weapons that tend to go to Mexico.  He had two handguns, a

Rubbo - Cross / By Mr. Ballesteros                    60

1    hunting rifle, and he did have an AK-47, and none of those --

2    those weapons were located here, they weren't being sent to

3    Mexico, correct?

4    A    Those weapons were located here.

5    Q    Okay.

6              THE COURT:  Just let me interrupt here.  Those

7    weapons, those four that were found at the time of the

8    accident, are any of those the ones identified here in

9    connection with this particular case?  We have a -- I know you

10   haven't see the PSR, but we have a list of them.  Any of those

11   -- these weapons?

12             THE WITNESS:  No, your Honor, I believe --

13             THE COURT:  Okay, so those are four extras.

14             THE WITNESS:  -- totally separate from firearms

15   purchased by straw purchasers.

16             MR. LOPEZ:  That's correct, your Honor.

17             THE COURT:  Okay.  And so you were able to identify

18   that those four weapons were purchased by other individuals.

19             THE WITNESS:  Yeah, absolutely.

20             THE COURT:  Okay.

21             THE WITNESS:  And we have statements made by Murillo

22   that -- saying that he purchased them, that he got them at a

23   gun show --

24             THE COURT:  Okay.

25             THE WITNESS:  -- from other individuals, not these

Rubbo - Direct / (Lopez) - Cross (Ballesteros)          61

1    individuals present.

2              THE COURT:  Although Murillo made that statement,

3    what I'm trying to confirm from you is that you have

4    confirmation that they were actually purchased by others.

5              THE WITNESS:  I can't recall exactly, and that's

6    going into Agent Weiss's investigation.  I can't recall whose

7    name was on the ATF form.

8              MR. LOPEZ:  Your Honor, I believe I can ask a

9    question that may clear up, --

10             THE COURT:  Okay.

11             MR. LOPEZ:  -- if I may just briefly.

12             THE COURT:  And I'm sorry to interrupt you --

13             MR. BALLESTEROS:  No, no, please.

14             THE COURT:  -- for just a second, but I want to

15   clarify this.

16                     **FURTHER DIRECT EXAMINATION**

17   BY MR. LOPEZ:

18   Q    If an individual purchases a gun at a gun show, is a Form

19   4473 going to be generated such that you can trace --

20   A    No, --

21   Q    -- who the buyer is.

22   A    -- you wouldn't.

23             THE COURT:  All right, go ahead.

24             MR. BALLESTEROS:  May I proceed?

25             THE COURT:  You may.

1          **CROSS EXAMINATION (RESUMED)**

2     **BY MR. BALLESTEROS:**

3     Q     And, Agent Rubbo, but you've got testimony that indicates

4     that he owned two of the weapons and he purchased two of the

5     weapons at the gun show, correct?

6     A     Yes.

7     Q     On the date of the accident.

8     A     On or around the time of the accident, yeah.

9     Q     Around that time, right.  He's indicating that he owned

10    two of those weapons prior to the date of the accident and he's

11    indicating that he purchased two of those weapons at the gun

12    show.

13    A     I believe so.

14    Q     And those were investigated by Agent Weiss and there's no

15    proof that those weapons went to Mexico or were destined to go

16    to Mexico.

17    A     No, just the reasonable assumption and statements made

18    that he was working with individuals tied to the Gulf Cartel.

19    Q     Reasonable assumption from an ATF agent, correct?

20    A     Yes.

21    Q     Okay, but on that date they had no information that those

22    weapons were going to Mexico.

23    A     I do not recall him making a statement saying that he was

24    taking them to Mexico.

25    Q     Because he did not make any statement.

```
                    Rubbo - Cross / By Mr. Ballesteros            63
```

 1   A    Okay.

 2   Q    Right.

 3          **MR. BALLESTEROS:**  And to -- if I could point the

 4   Court to Table F on the PSR, I had it on my page 14 but I'm

 5   going off the older version.

 6          **THE COURT:**  I have it.

 7   **BY MR. BALLESTEROS:**

 8   Q    Those are the four weapons that were --

 9          **MR. BALLESTEROS:**  May I approach, Judge?

10          **THE COURT:**  Yes.

11   Q    Agent Rubbo, if I may show you Table F --

12          **MR. LOPEZ:**  Your Honor, I don't really feel

13   comfortable with him showing PSRs to the agent, but --

14          **MR. BALLESTEROS:**  I just want to --

15          **THE COURT:**  It's really just the table so it doesn't

16   really include much beyond --

17          **MR. LOPEZ:**  If the Court's --

18          **THE COURT:**  Yeah, no, it doesn't --

19          **MR. LOPEZ:**  -- okay with it, then I have no problem.

20          **THE COURT:**  -- include much beyond that but -- and

21   it's really -- I mean, it has Ms. Sandoval there and he's

22   already testified about her as well, so --

23          **MR. BALLESTEROS:**  I'm referring to Table F, Judge.

24          **THE COURT:**  I have that but Table E right above that

25   on my --

1          **MR. BALLESTEROS:**  Oh, got it.

2          **THE COURT:**  -- PSR is Ms. Sandoval so --

3          **MR. BALLESTEROS:**  Okay.

4    BY MR. BALLESTEROS:

5    Q    Table F has October 17th, 2015, as the date they were

6    recovered.  It's got the Kel-Tec, it's got the Rock Island

7    Armory .38, the Kel-Tec .380, the IO Inc. -- this is the AK-47.

8    A    Yes.

9    Q    And then the Remington 700 .308 rifle which is a hunting

10   rifle, correct?

11   A    Yeah, that's correct.

12   Q    Okay, so those weapons are included as part of the four

13   attributed to Mr. Murillo, right?

14   A    Yes.

15   Q    Okay, and those were the weapons recovered at the

16   accident.

17   A    That's correct.

18   Q    Okay.  Three of them are handguns aren't normally used by

19   cartels, correct?  Three of those weapons.

20   A    I wouldn't think that's fair to say.  I mean, they use all

21   kinds of different weapons.

22   Q    Okay, sure.  So total weapons for Mr. Murillo is -- are we

23   still going off the number 28?

24   A    Let me see.

25          **THE COURT:**  Let me ask you this way.  We have -- just

1    looking at the chart here, we come up with 18 between Marella

2    and Miguel, correct?  I mean, that's simple math.

3              **THE WITNESS:**  Yes.

4              **THE COURT:**  Okay.  And then we have from your

5    investigation, you are convinced that between Felix Hernandez

6    and Mariano Garcia that there were additional weapons purchased

7    for Mr. Murillo, correct?

8              **THE WITNESS:**  That is correct.

9              **THE COURT:**  What you can't say is definitively which

10   ones were and specifically how many; is that correct?

11             **THE WITNESS:**  That is correct, your Honor, I cannot.

12             **THE COURT:**  Okay, and then you know that he

13   definitively had four weapons at the time of the accident.

14             **THE WITNESS:**  Yes.

15             **THE COURT:**  Okay, all right.

16   **BY MR. BALLESTEROS:**

17   Q    And he had the additional number five is the weapon he had

18   when he was arrested for this offense which was also a handgun,

19   correct?

20   A    Yes, that's correct.

21   Q    Okay.  And then Carlos Zamudio doesn't have a number next

22   to him.  How many weapons approximately did Carlos Zamudio --

23   were attributed to Carlos Zamudio?

24   A    I know that Carlos Zamudio had a lot of firearms.

25   Q    Over a hundred.

Rubbo - Cross / By Mr. Ballesteros                    66

1   A    Right, yes.

2   Q    Over 140.

3   A    I just an approximate say that he had approximately a

4   hundred firearms associated with him.

5           MR. LOPEZ:  I'll clear it up during --

6           MR. BALLESTEROS:  Okay.

7   BY MR. BALLESTEROS:

8   Q    And you indicate that Carlos Zamudio and Jesus Murillo

9   were working together is what you stated, correct?

10  A    Yes, I did.

11  Q    Okay, and how did you get that information?

12  A    That was from a cooperating stating that not only he,

13  Zamudio himself, but Murillo were working for another

14  individual taking these firearms to a common individual, Luis

15  Morales, this Fanulano (phonetic).

16  Q    But at any point in your investigation, whether it was the

17  cooperating testimony or actual -- anything in your

18  investigation that showed that Jesus Murillo and Carlos Zamudio

19  were purchasing weapons together?

20  A    By "together," I mean, at the same time.  There are

21  statements made that -- from Zamudio that he was with Murillo

22  as well as Hernandez brothers at the same time so --

23  Q    Okay, what --

24  A    -- or kind of going out in two separate vehicles, Zamudio

25  with Garcia, Murillo with either one or the other Hernandez.

Rubbo - Cross / By Mr. Ballesteros                    67

1   Q    Okay, what statement was that, that Carlos Zamudio was at

2   the same time getting together with everyone else here involved

3   or most of the other people involved and going and purchasing

4   weapons?

5   A    Yeah, right about that, at the same time.

6   Q    There's a statement.

7   A    There is a statement.

8   Q    And who made that statement?

9   A    Carlos Zamudio.

10  Q    Okay, and when you asked Carlos Zamudio, this is the

11  debrief, correct?

12  A    This is correct.

13  Q    And this is after he had already been arrested.

14  A    This -- yes, sir.

15  Q    Okay.  And when you asked Carlos Zamudio about him working

16  for -- with Jesus Murillo, he indicated he did work with Jesus

17  Murillo.

18  A    That they were out purchasing firearms for the same

19  individual, working towards the same goal but not -- I wouldn't

20  go so far as to say that these two were on the same page

21  working together, coordinating everything together.

22  Q    It's more the fact that Zamudio indicated that he thought

23  Murillo was also purchasing for Morales-Medrano and his

24  brother.

25  A    That's correct.

Rubbo - Cross / By Mr. Ballesteros                    68

1  Q    That would be an accurate way to represent it, right?

2  A    Yes, sir.

3  Q    Okay.  And then the way the chart is here, Jesus Murillo,

4  it shows he recruited Marella Sandoval on her own, correct,

5  with Pedro Ruiz?

6  A    Yes.

7  Q    Pedro Ruiz hasn't been indicted or charged.

8  A    No, he has not.

9  Q    Okay, and all these statements that you mentioned earlier

10 on Marella Sandoval as far as her being recruited by Jesus

11 Murillo and Pedro Ruiz?

12 A    Yes, at the same time.

13 Q    Why do you make that assumption?

14 A    Marella stated that she went out and she met with both

15 these individuals at a -- I believe it was a restaurant prior

16 to going to the purchase of the firearms.  Both these

17 individuals came up with a plan.  The reason why I say that it

18 was Pedro Ruiz who had an involvement was because Ruiz had a

19 closer relationship with Marella Sandoval.  He identified her

20 as a person that could purchase for Murillo.  Ruiz and Murillo

21 are close, have a close friendship together.  After Ruiz

22 identified her and through statements made by Marella, Ruiz was

23 paid basically a finder's fee for finding Marella Sandoval for

24 Murillo.  Sandoval stated that Murillo paid Ruiz approximately

25 two to $300 for introducing her to him to purchase firearms for

1   him.

2   Q    Okay, and this came from Ms. Sandoval to -- this is

3   statements that she made to Mr. Ruiz?  How did she find out

4   that he was paid a finder's fee?

5   A    She -- because she was there.  She stated she was there,

6   stated that she knew at the time so --

7   Q    And, Agent Rubbo, just to be completely clear, is it --

8   this plan that you're talking about, is it not the plan to

9   initially lie to the agents about what had happened to the

10  weapons?

11  A    This is --

12  Q    Or is it the plan that they got together and said let's

13  recruit Marella?

14  A    That plan was devised after --

15  Q    Right.

16  A    -- the purchase of the firearms, after ATF started talking

17  to her.

18  Q    You're saying Ms. Sandoval indicated that Mr. Murillo and

19  Mr. Ruiz got together, planned on recruiting her, and ended up

20  recruiting her.

21  A    That's correct.

22  Q    And that's in the reports provided by the U.S. Attorney's

23  office.

24  A    Yes.

25  Q    And Mr. Murillo normally paid $300 for the purchase of the

Rubbo - Cross / By Mr. Ballesteros                    70

1    firearms, correct?

2    A    Anywhere from 150 to $300, I believe.

3    Q    Well, but --

4    A    For her.

5    Q    -- Mr. Murillo specifically normally paid $300, not 150.

6    A    Three hundred.

7    Q    Correct?

8    A    That's correct.

9    Q    Right.  Other individuals, Mr. Zamudio, other people, they

10   might have paid less, they might have paid more, correct?

11   A    That's correct.

12   Q    With Ms. Sandoval it was negotiated, correct?

13   A    It was negotiated prior to.

14   Q    And it was negotiated up, correct?

15   A    Yeah, absolutely, yes, it was.

16   Q    He gave her more money.

17   A    Yes.

18   Q    And so you're saying that even though he gave Ms. Sandoval

19   $400 instead of the $300 and then gave Mr. Ruiz money, that

20   wouldn't leave any profit to say for Mr. Murillo if he gave

21   Mr. Ruiz a finder's fee, correct?

22   A    He would still make a profit off of it.  You're looking at

23   $400 a firearm just for her, negotiating a sale of it he could

24   get anywhere between 1,500 to 2,000 for that firearm.

25   Q    Well, and we know he got 1,500 for them, right?

```
                     Rubbo - Cross / By Mr. Ballesteros              71
```

1    A    So --

2    Q    I mean, that's --

3    A    -- based on what he said.

4    Q    -- the information you have.

5    A    Yeah.

6    Q    Okay.  Mr. Rene Hernandez, his -- he was recruited by

7    Mr. Cervantes, correct?

8    A    No, it was actually -- from statements made, it was the

9    other way around.

10   Q    Okay, but statements made by who?

11   A    Statements made by Miguel Cervantes.

12   Q    Okay, so Miguel Cervantes, the individual who cooperated

13   initially and is out on bond, he's the one that initially said

14   that he was recruited by Mr. Rene Hernandez.

15   A    Yes.

16   Q    Okay.

17   A    And Rene Hernandez introduced him to Jesus Murillo.

18   Q    Okay, but you have contradicting statements that indicate

19   that Mr. Murillo contracted -- or recruited Mr. Cervantes and

20   then Mr. Cervantes recruited Mr. Rene Hernandez only, correct?

21   A    That's correct.

22   Q    Okay.  On Felix Hernandez, you've indicated that -- did

23   Miguel Cervantes also purchase weapons for Felix?

24   A    For which individual?

25   Q    For Felix Hernandez.

Rubbo - Cross / By Mr. Ballesteros                              72

1   A    No.

2   Q    No, just for Rene Hernandez, okay.

3   A    And I would say with Rene Hernandez for Murillo.

4   Q    Okay, so Rene Hernandez and Miguel Cervantes, they

5   purchased weapons together for Mr. Murillo.

6   A    Yes.

7   Q    And Felix Hernandez, you said that at least one of those

8   weapons can be attributed to Mr. Murillo that he purchased.

9   A    For Felix Hernandez?

10  Q    Yeah.

11  A    Yes.

12  Q    The statement by the prosecutor was at least one weapon

13  can be attributed to Mr. Zamudio and one weapon could be

14  attributed to Mr. Murillo.

15  A    That's correct.

16  Q    Okay, and how do we know that?

17  A    Basically through statements made going back through

18  statements made by Zamudio of who purchased what and when.

19  Q    So all these are statements from individuals who have

20  cooperated that initially misled the law enforcement.

21  A    Yes.

22  Q    Okay, and now you're taking those statements at their word

23  because now they've got incentive to --

24  A    We're taking those statements, trying to verify, bumping

25  off of other people's statements, 4473 of when they purchased,

1   what guns were purchased, kind of trying to pinpoint exactly

2   the specifics of what was said.

3   Q    And I know, Agent Rubbo, that's really hard on your part,

4   but at the same time, when the Judge is going to make a

5   determination as to the amount of weapons, you for 100 percent

6   sure can't say that one of those weapons belonged to

7   Mr. Murillo.

8   A    That's correct.

9   Q    Okay.  And all these statements also that the weapons were

10  going to Mexico, that's not in the reports.  The reports

11  indicate that Mr. Cervantes overheard -- and this is the first

12  person that gave a debrief -- overheard Mr. Hernandez and

13  Mr. Murillo talking and that they indicated somehow that the

14  weapons were going to Mexico.

15  A    Yes.

16  Q    Okay.  And some of these weapons did end up in Mexico and

17  were recovered in Mexico.

18  A    Yeah, that's correct.

19  Q    Okay, but other than Mr. Cervantes's statement, at no

20  point did anyone else say that these weapons were going to

21  Mexico.

22  A    Well, Murillo did state that he was working with

23  individuals tied to the Cartel, to individuals working for

24  Comandante Toro.

25  Q    Well, let me put it this way.  The information that you

Rubbo - Cross / By Mr. Ballesteros                    74

1   had that the weapons were going to Mexico was based on

2   Mr. Cervantes.

3   A    The majority of it is information from Cervantes stating

4   that Murillo stated that that is correct, that what you said.

5   Q    That he overheard.

6   A    Yeah.

7   Q    And at some point these weapons were also -- it was

8   indicated that these weapons were going up north.

9   A    Yes, it was.

10       **(Pause)**

11  Q    How many people did Mr. Murillo recruit based on this

12  chart?

13       **(Pause)**

14  A    Based on this chart or over -- based on this chart, you

15  have several different individuals.  You have five and that's

16  not including other individuals who may have purchased for

17  Murillo that we have not identified.

18  Q    Okay.  Which five would that be?

19  A    Marella Sandoval, Miguel Cervantes, Rene Hernandez, and

20  even Felix Hernandez and Mariano Garcia.

21  Q    So there -- you have information that Mr. Murillo

22  personally recruited these five individuals.

23  A    I have information that he said that he recruited -- had

24  Miguel Cervantes go out -- or he didn't have Miguel Cervantes

25  go out, he stated that Miguel Cervantes provided four to five

1   of his friends to purchase firearms.  Whether that was true or

2   not, --

3   Q    We don't know.  So you have information that Miguel

4   Cervantes, that Mr. Murillo recruited Miguel Cervantes and

5   Miguel Cervantes recruited other individuals.

6   A    Yes.

7   Q    How many we don't know.

8   A    Correct.

9   Q    Right.  We don't have any proof of that, right?

10  A    No.

11  Q    We just know that he purchased several weapons and he

12  recruited at least Miguel Cervantes and maybe one or two other

13  individuals.

14  A    He -- Murillo at least recruited Hernandez and Sandoval.

15  Q    Well, the information you have or sure is that he

16  recruited Cervantes and Sandoval, right?

17  A    Of those -- kind of Hernandez and Cervantes, I kind of put

18  those guys together --

19  Q    Together.

20  A    -- because they both were present, both --

21  Q    Okay, but that would be three at most --

22  A    But he picked out --

23  Q    -- that he recruited.

24  A    -- both of them and was a major factor in getting them to

25  the FFL to purchase firearms.

1    Q    Right, and he paid them, he got them there, he took them.

2    A    Yeah.

3    Q    There's information that he took them, but just those

4    three, correct?

5    A    Correct.

6    Q    Okay, the other ones you're not sure.

7    A    Not a hundred percent sure.

8    Q    Right.

9         **MR. BALLESTEROS:**  I have no further questions, your

10   Honor, I'll pass the witness.

11        **MR. LOPEZ:**  Briefly, your Honor.

12        **THE COURT:**  Briefly.

13                    **REDIRECT EXAMINATION**

14   BY MR. LOPEZ:

15   Q    There was one statement made and I just want to be clear

16   on the record, we do not have any information that Murillo

17   purchased for Lizandro Salvador Morales-Medrano; is that

18   correct?

19   A    That is correct.

20   Q    Okay, the next thing is in relation to Felix Hernandez,

21   there were statements made that he purchased for both Carlos

22   Zamudio and Jesus Murillo, and is that why we're able to

23   attribute at least one gun to both of those individuals?

24   A    That is correct.

25   Q    Defense counsel made a statement that we're just taking

1   these statements at face value.  Did you go back and look at

2   the 4473's and/or the timing of these purchases through sales

3   receipts to indicate that Felix Hernandez did make some

4   purchases at -- or on the same day, sometimes even within

5   minutes, as some of the other individuals that were recruited

6   by Jesus Murillo?

7   A    Yes, you have statements made that certain firearms were

8   purchased, certain firearms being -- whether it be a SCAR 17S

9   or something descriptive as even two handguns from Felix

10  Hernandez.  At the time, you can go back and through the use of

11  4473's, you can tell who was purchasing firearms either at the

12  same time or relatively close, and relatively close by a few

13  minutes apart.

14  Q    And is that the same thing that -- we didn't -- you don't

15  just take Mr. Zamudio's statements at face value.  You did the

16  same thing with Mariano Eberth Garcia, you went back, checked

17  on 4473's, and there are some purchases that he makes within

18  minutes of some -- of Mr. Rene Hernandez as well at some of

19  these FFLs.

20  A    That is correct.

21       **MR. LOPEZ:**  Okay, your Honor, I believe that that

22  sums up.

23       **THE COURT:**  Okay, all right.  Agent, you may step

24  down, okay.

25       **THE WITNESS:**  Thank you, your Honor.

1          **(Witness steps down)**

2              **THE COURT:**  Okay, let's take a really short break and

3    then I'll come back and we'll begin with the legal objections.

4              **MR. LOPEZ:**  Okay.

5              **THE MARSHAL:**  All rise.

6          **(Recess taken from 10:37 a.m. to 10:44 a.m.)**

7              **THE MARSHAL:**  All rise.

8              **THE COURT:**  All right, thank you, you may be seated.

9    Okay, let me -- I think I'll work through the objections in the

10   order in which the testimony was presented, so let's begin with

11   Mr. Cervantes.  Let me make sure I find it here.  Okay, and

12   let's right now address the legal objections and then we'll

13   come back to hear a full allocution from both counsel and the

14   Defendant.  And then as I'm addressing objections, to the

15   extent that there's any objection made as to one defendant that

16   is the same objection made as to any other defendants, although

17   here I don't think we have a lot of that, but to the extent

18   that it is, then counsel can speak up at the same time.  And I

19   may not recognize it right away, but you feel free to let me

20   know that that applies to you as well.

21              So, okay, so as to Mr. Cervantes, I think that the

22   first one which I think for the Court is easier is as far as

23   the number of weapons here involved.  In that regard --

24              **MR. LOPEZ:**  And the Government would concede that as

25   well, your Honor.

1          **THE COURT:**  Okay, so in that regard, in light of the

2    fact that even though Mr. Cervantes may have claimed eight,

3    that it would be certainly easy I think to misstate that.  The

4    Court will sustain the objection as to the enhancement.  Yes,

5    but when we get to that part.  As to the enhancement for

6    paragraph 65, that will drop to a two rather than the four, so

7    that one is easily taken care of.  The other one that we have

8    here, and let me go to that one before I even -- I know I'm

9    making the objections for you here, Mr. Garcia, but the other

10   one that I have, and that is to paragraph 66 and 67, and this

11   may apply across the board to some other defendants.  To the

12   extent that the trafficking enhancement is applied, part of

13   which the consideration there, of course, you know, that two or

14   more weapons is easy to establish.  But part of the

15   consideration there is the part about going to an individual

16   who intended to dispose of the firearms unlawfully, in that

17   regard and to the extent -- now, we may have some issues as far

18   as they were going to a prohibited person, but to the extent

19   that we're looking at this enhancement and that the basis for

20   the enhancement is that the weapons were going to an individual

21   who intended to dispose of the firearms unlawfully, and that

22   unlawful activity was the going to Mexico, which I think for

23   Mr. Cervantes is one of them.  And then to the extent that we

24   have an enhancement under (b)(6) for the same going to Mexico,

25   that the Fifth Circuit has said is double counting, so that

1  will not be applied.  And I think for -- so for Mr. Cervantes,

2  what we do have the PSR reflecting for him as to that

3  enhancement for 66, the (b)(5) is because they were going to

4  Mexico, and then we have the same thing.  But if there's --

5          **MR. LOPEZ:**  Your Honor --

6          **THE COURT:**  -- something else to consider, I'll

7  certainly --

8          **MR. LOPEZ:**  -- I believe there is something else to

9  consider, your Honor.  These firearms are being purchased by

10  Mr. Cervantes.  The only basis for the (b)(5) is not that they

11  were going to Mexico, but they're also being transported to

12  unlawful users of --

13          **THE COURT:**  Well, what it indicates is they're being

14  transferred -- the PSR -- and I did -- keep in mind, now, I've

15  heard a lot of testimony now here and of course I've read all

16  the PSRs together.  The PSR reflects that they were transferred

17  to Rene Hernandez and so I guess the Government's position is

18  that Rene Hernandez himself is a prohibited person because of

19  the drug use.  I can sort of address that but I sort of need to

20  address it through Rene Hernandez.  So if that's your position,

21  I can --

22          **MR. LOPEZ:**  That's correct, your Honor.

23          **THE COURT:**  -- consider it, okay.

24          **MR. LOPEZ:**  That is the position.

25          **THE COURT:**  Okay.

1          **MR. LOPEZ:**   But the Government does not seen any

2    other additional basis beyond those two for the trafficking.

3          **THE COURT:**   Okay, so in that regard, I may have to

4    sort of address both of these together, but maybe let me -- and

5    my concern in that regard would be sort of a sign as the

6    trafficking enhancement and the unlawful activity enhancement

7    both being based on the going to Mexico because the base

8    offense level is also determined on some of the same.  And if

9    we're looking at the base offense level and making that 20

10   based on the fact that they're being transferred to a

11   prohibited person -- but now I will say that I didn't

12   specifically look at that issue but I would tend to believe

13   that that would be the same prohibited double-counting.

14         **MR. LOPEZ:**   I unfortunately do not have an answer for

15   the Court.  I've gone and looked for that issue at length in

16   various other cases and I have yet to find a court that

17   addresses the application between 2K2.1's base offense level

18   and the (b)(5) section, your Honor, in relation to the

19   prohibited person aspect.

20         **THE COURT:**   So what I would say in that regard is

21   that generally speaking, the guidelines, there are sometimes

22   when the guidelines speak directly to even though this

23   enhancement is applied, this other specific enhancement can

24   still be applied.  In this case, the guidelines, in looking at

25   the base offense level, do not speak specifically to whether if

1   the base offense level is based as one of the considerations is

2   that they're going to a prohibited person, then you can still

3   apply (b)(5) based on the same conduct.  So the guidelines

4   don't speak directly to that, so absent that then I would say

5   that generally speaking, if it is the same conduct, the same

6   conduct is not considered for two separate enhancements, that

7   generally speaking that is -- the same conduct only warrants

8   two separate enhancements when the guidelines specifically so

9   provide.  So we're looking under paragraph 64 at the base

10  offense level, if we're looking at that one, based on the fact

11  that the transfer was to a prohibited person, that being Rene

12  Hernandez, then I would say we would not apply --

13          **MR. LOPEZ:**  The trafficking.

14          **THE COURT:**  -- the trafficking -- well, we could

15  apply the trafficking as -- because they're going to Mexico,

16  but we wouldn't apply then 67.  So in other words, we're going

17  to have one of these knocked out, I think.

18          **MR. LOPEZ:**  And if that's the Court's position, the

19  Government does understand that's the Court's position.

20  Unfortunately, your Honor, I've searched at length to figure

21  out what the Fifth Circuit would do and any other courts in the

22  field for that matter and I've yet to find anything on --

23          **THE COURT:**  Well, I think based on what they have

24  done as to (b)(5) and (b)(6) in finding that you can't count

25  this -- use the same conduct, then -- and even though I

1    recognize that that is based on specific language they

2    reference in the guidelines, again, absent specific direction

3    under the guidelines that say apply both enhancements, I think

4    the rule of leniency at the very least would say that you do

5    not apply both enhancements here.

6            **MR. LOPEZ:**  Very well, your Honor.

7            **THE COURT:**  Okay, all right, so then maybe let's

8    begin with the issue here as -- and, Mr. Garcia, maybe now I'll

9    let you speak, having already called you forward, maybe now

10   I'll let you speak.  Okay, --

11           **MR. GARCIA:**  Yes, Judge.

12           **THE COURT:**  -- so the -- let's go ahead and just go

13   down one by one, and to the extent that I need to sort of come

14   back to another defendant at the same time, I'll do so.

15           **MR. GARCIA:**  Yes, your Honor.  The only remaining

16   objection that I have is the role, your Honor.  If we -- the

17   Court would consider maybe even a minimal role, your Honor.

18   His sole involvement was that they used his signature and his

19   identity, your Honor.  He was even literally picked up at his

20   house, driven around, told what to purchase, given the money to

21   purchase these firearms; and as soon as he purchased him, they

22   were taken -- he -- you know, from his possession.  That was

23   the extent of his role in this offense so we'd has the Court to

24   consider a minimal role.

25           **THE COURT:**  Okay, you know, I understand the

```
 1    arguments.  Again, the guidelines speak to less culpable than
 2    the average participant.  And here this is one of those, you
 3    know, cases where we have a lot of participants, and I just
 4    don't see that Mr. Cervantes is less culpable than the average
 5    participant.  I certainly don't think that he rises to any kind
 6    of leadership role, management, organization, or anything of
 7    that nature, but I certainly also don't see that he is less
 8    culpable than the average participant, so that request is
 9    denied.  I do have the Government's motion as to him I believe,
10    correct?
11             MR. LOPEZ:  It was filed, your Honor.
12             THE COURT:  Okay, all right, so I do have that and
13    that will be considered when we come back to him, but I do have
14    that.  So then to be clear -- and I think the easiest one for
15    Mr. Cervantes to do is to basically knock out the enhancement
16    on paragraph 67 so that that ends up not applied whatsoever.
17    So --
18             MR. GARCIA:  And the minus --
19             THE COURT:  And the -- right, correct.
20             MR. GARCIA:  -- on the --
21             THE COURT:  So -- okay, so I've --
22             MR. GARCIA:  -- that second firearm.
23             THE COURT:  -- sustained the objections to paragraph
24    65.  That is only a plus two.  And that's the same objection as
25    to paragraph 67.  And so then we are for Mr. Cervantes a 26
```

1    before the -- and as to all these defendants, is there a motion

2    from the Government as to the third point?

3         **MR. LOPEZ:**  To the extent that it applies, your

4    Honor, the Government so moves.

5         **THE COURT:**  Okay, all right, so then I think for

6    Mr. Cervantes, we would be 26 -- at 23.

7         **MR. LOPEZ:**  Yes, that's the Government's calculation,

8    your Honor.

9         **THE COURT:**  Okay, and then we'll come back again as I

10   indicated earlier.  Let me find a chart here.  I have

11   Mr. Cervantes at 46 to 57.

12        **MR. LOPEZ:**  That's what the Government has as well,

13   your Honor.

14        **THE COURT:**  Okay, all right, so then we will come

15   back -- having dealt with the guideline objections, we'll come

16   back to Mr. Cervantes.  Okay, let me move to Ms. Sandoval.

17        **MS. GUTIERREZ:**  Good morning, your Honor, Lilly

18   Gutierrez on behalf of Ms. Sandoval.

19        **THE COURT:**  Okay, and for Ms. Sandoval, let me -- the

20   objection that I would like to start with is the objection as

21   far as whether she had a prior conviction.  In that regard, the

22   Court did some research.  There is a case out of the Fifth

23   Circuit, it's *United States versus Padia* -- and it's spelled P-

24   A-D-I-A, not I-L-L-A -- that speaks to the issue.  And they

25   don't use the term "deferred adjudication," but clearly what

1  they are referencing there is a deferred adjudication.  Under

2  Texas law, the charge in that case was a 922(h) and 924 charge.

3  So looking at that particular statute and what the Fifth

4  Circuit says is that basically the fact that it is -- and,

5  again, they are not using the term "deferred adjudication," but

6  what they specifically say is the -- that in that case the

7  defendant was placed on probation for three years, then the

8  probation was reduced and probation was terminated.  The court

9  then set -- the State Court then set aside the guilty verdict

10  and dismissed the indictment.  So that's basically deferred

11  adjudication, even though, again, they don't use that term.

12       **MR. LOPEZ:**  Your Honor, in reference to the

13  conviction aspect of it, the Government concedes that portion.

14  However, your --

15       **THE COURT:**  Concedes what?

16       **MR. LOPEZ:**  The fact that she wasn't actually --

17       **THE COURT:**  Well, this is -- well, let me finish

18  here, okay?  The Fifth Circuit it says basically that that does

19  not alter the status as a convicted felon under Federal gun

20  laws.  So I'm not sure why the Government's conceding.

21       **MR. LOPEZ:**  Your Honor, --

22       **THE COURT:**  Is there something newer?  I mean, if

23  there's something --

24       **MR. LOPEZ:**  -- if at the time that they are under

25  deferred adjudication, the Government does agree that at that

1    point in time they are prohibited.  To the extent that it's a -

2    - something that is a -- it's a --

3           **THE COURT:**  Well, but see here again the Fifth

4    Circuit -- okay, so in the -- in this case, the defendant on

5    August the 26th of 1977 sold the rifles, okay?  And what the

6    record established was that on May the 2nd of 1977, the court

7    set aside the guilty verdict and dismissed the indictment.  So

8    that was before he sold the rifles.  I understand what the

9    agent testified to, but what the Fifth Circuit is looking at,

10   the agent does not determine the law in the case.   I  do,

11   so --

12          **MR. LOPEZ:**  No, and I understand that, your Honor.

13   But I had a case fairly recently where I looked up this issue

14   and --

15          **THE COURT:**  And do you have a case for the Court?

16          **MR. LOPEZ:**  I don't have it on me at the time, your

17   Honor.  It was unrelated to the instant matter, your Honor, but

18   where -- and if you give me some time, I don't want to misstate

19   the law to the Court, but it was my impression that if it --

20   the indictment was pending while they were on deferred

21   adjudication, at that point in time (indiscernible)

22          **THE COURT:**  Well, but because that's under

23   indictment.

24          **MR. LOPEZ:**  Yes.

25          **THE COURT:**  That -- what that makes it is under

1    indictment.  That's a different provision of the law.

2              **MR. LOPEZ:**  Yes.

3              **MS. GUTIERREZ:**  Your Honor, may I interject?

4              **THE COURT:**  Uh-huh.

5              **MS. GUTIERREZ:**  Yes, I also did some research and I'm

6    surprised I didn't find the -- did you say 1978 --

7              **THE COURT:**  Seventy-eight.

8              **MS. GUTIERREZ:**  -- case?

9              **THE COURT:**  Seventy-eight.

10             **MR. LOPEZ:**  Your Honor, if it is a '78 case, there

11   were some changes to the definition of a convicted person

12   within 921 that may be the basis --

13             **THE COURT:**  Well, that might be the basis although I

14   will say, I mean, I looked to see the history of this and I

15   didn't see that it was subsequently -- but it may be not come

16   up since then, but --

17             **MS. GUTIERREZ:**  And, your Honor, I found nothing on

18   point with respect to this specific issue.  All the cases that

19   I read had to do with a person being on deferred adjudication,

20   and while they're on deferred adjudication, they're considered

21   to be under indictment.

22             **THE COURT:**  Correct, I don't disagree with that.

23             **MS. GUTIERREZ:**  And so --

24             **THE COURT:**  That's easy.

25             **MS. GUTIERREZ:**  -- I do think that it's interesting

1    that this *Padia* case does indicate that even though the case

2    was dismissed, the action that occurred subsequent to that is

3    considered a conviction.  And I say that because the case law -

4    - I mean, well, the commentary sends us to two different other

5    statutes.  Well, one statute, 922 I believe, and two sections.

6    And both of those sections indicate what is a prohibited

7    person.

8              **THE COURT:**  Correct.

9              **MS. GUTIERREZ:**  Nothing in that -- those sections

10   state that a person who's on deferred adjudication is a

11   prohibited person.  So I think that the crux of this is the --

12             **THE COURT:**  Well, actually -- and I'm looking

13   specifically at the statute regarding prohibited person.  And

14   the *Padia* case, I came across it by the annotations to 922 and

15   so it was under 922 that I found the *Padia* case.  So I'm

16   willing to -- if -- now, again, when we talk about "under

17   indictment," that's a different issue, and I don't know in your

18   case if you were looking at the issue under indictment only and

19   I, you know, have no dispute with that.  But this is what I

20   found.  And, again, --

21             **MR. LOPEZ:**  I can --

22             **THE COURT:**  -- I have to follow the law.  I can't --

23             **MR. LOPEZ:**  No --

24             **THE COURT:**  -- just go based on instinct so --

25             **MR. LOPEZ:**  No, no, I understand, your Honor.  I

1    don't anticipate that it would take me very long to rush back

2    down to the office.  And I'm not meaning to instruct the Court

3    (indiscernible)

4          **THE COURT:**  Okay, well, and I have no problem with we

5    need to look at it a little bit closer but, again, I -- you

6    know, this is what I've come across.  And I looked at various

7    afterwards and I will say I didn't find anything in the last

8    five years but -- and if there is a change in the statute that

9    might make a difference, 922, you know, doesn't -- and I looked

10   there, and really when I was looking at it, you know, it's

11   basically convicted felon and this is what I came across so --

12         **MR. LOPEZ:**  Your Honor, it's not so much though the

13   change in the 922 statute as much, if I remember correctly --

14   and if the Court would indulge us for just a little bit of time

15   in relation to this issue as to this Defendant, the Government

16   would certainly appreciate it.  As far as I remember, there was

17   changes to the 921 statute that proposed the definitions that

18   should be followed in 922.

19         **THE COURT:**  Except that what we're looking at here --

20   well, and I guess 921 might come into play.  But when we look

21   at here, what we're looking at is the guidelines specifically

22   define "prohibited person" as defined by 922.  So do we

23   incorporate 921 into 922?  I don't know because the guidelines

24   reference 922.

25         **MS. GUTIERREZ:**  Yes, your Honor, but if we were to

 1   read 922 based on the definitions of 921, --

 2          THE COURT:  Yeah.

 3          MS. GUTIERREZ:  -- I do think that they --

 4          THE COURT:  They might, yeah.

 5          MS. GUTIERREZ:  -- apply.  And, your Honor, with

 6   respect to the fact that the Court has provided this case that

 7   I was unaware of, I also would request a short amount of time

 8   in order to -- this is obviously a very important objection

 9   because it has a great difference in the levels of where we

10   believe we stand and where we might end up if this objection is

11   overruled.

12          THE COURT:  I certainly don't, you know, disagree

13   with that.  I -- you know, and we can one -- do one of two

14   things.  We can return -- I don't know what time we're going to

15   be done, but we can return either this afternoon or if

16   necessary we could pick it up tomorrow morning.  I'm just

17   looking at 921 very quickly to see whether it gives us anything

18   because if the answer is there and it supports the objection,

19   then that would be easy to take care of.  See -- and, you know,

20   I'm not sure that that's going to change anything because when

21   I'm looking at -- and it's Section 20 under 921 speaking to the

22   term crime punishable by imprisonment for a term exceeding one

23   year, it states that that shall be determined in accordance

24   with the law of the jurisdiction in which the proceeding is

25   held, so that would be determined by Texas law.  And then it

1  does go on to say -- to state, "Any conviction which has been

2  expunged or set aside for which a person has been pardoned or

3  has had civil rights restored shall not be considered a

4  conviction."  And in that regard, one of the things that I

5  don't remember if it was this case or some of the other cases

6  that I was looking at, but basically spoke to the fact that in

7  Texas, a deferred adjudication is not considered an expunged

8  record unless, I mean, in some cases they may ultimately be

9  expunged, but that's not the same thing.  And it is not one

10  where it is set aside and civil rights restored.

11          **MS. GUTIERREZ:**  I'm sorry, your Honor, did you read

12  that an offense that is set aside or conviction that is set

13  aside?

14          **THE COURT:**  No, a -- any conviction which has been

15  expunged or set aside.

16          **MS. GUTIERREZ:**  And that's where I think that the

17  deferred adjudication never gets to a conviction to be set

18  aside.

19          **THE COURT:**  I understand what you're saying but I

20  know what the Fifth Circuit is saying as well and because --

21          **MR. LOPEZ:**  And I think that was the definition that

22  gave us some pause, your Honor, to be honest because I believe

23  the case that the Court has cited predates the statutory

24  amendments to that definition, which is what caused us some

25  pause --

1          **THE COURT:**  Although I do -- I will tell you that in

2    looking at some of these cases, you know, that was -- that

3    language was specifically referenced and it really didn't

4    change anything.  So nonetheless I will give you an

5    opportunity, so I guess the question is do we pick up some time

6    this afternoon or --

7          **MR. LOPEZ:**  I -- your Honor, I think I could be ready

8    this afternoon.  This is an issue that I've already looked at.

9    I just need to go back and pull that same research but I don't

10   know --

11         **THE COURT:**  I -- Ms. Gutierrez?

12         **MS. GUTIERREZ:**  Your Honor, I'd prefer tomorrow

13   morning.  I will be here for a preliminary and detention

14   hearing at 11:00 o'clock --

15         **THE COURT:**  Okay.

16         **MS. GUTIERREZ:**  -- so the Court could set it any time

17   before that.  But I would like that opportunity to --

18         **THE COURT:**  To look at that.

19         **MS. GUTIERREZ:**  -- do it without haste.

20         **THE COURT:**  Okay, I have a very long docket tomorrow.

21   That's what I see.  Incidentally, and I'm so sorry to say, I'll

22   probably make a formal announcement later on, but incidentally

23   Ms. Belmares is leaving me the first week of April.  But it's

24   all good.  Ms. Belmares is actually going to -- and I hope she

25   is not bothered by the fact that I'm announcing, but

1  Ms. Belmares is going to start law school in August.

2          **MS. GUTIERREZ:**  Congratulations.

3          **THE COURT:**  And so she will be leaving me.  And

4  Ms. Julie, whose name I have -- last name I have now forgotten

5  -- Sanchez will be my new case manager.

6          **MR. LOPEZ:**  Your Honor, --

7          **THE COURT:**  So here's what I started to say is I have

8  a very long docket tomorrow morning because I've moved my

9  afternoon docket to the morning before I have to head out to

10  Laredo tomorrow.

11         **MR. LOPEZ:**  Your Honor, if I may briefly, your Honor,

12  I also believe that while this issue is of great academic

13  importance, and certainly for her sentencing guideline

14  purposes, nonetheless the Government still believes that it

15  should be a base offense level 20 because it was being

16  transferred over to the Defendant Murillo who was subsequently

17  going to be exporting it.  There (indiscernible)

18         **THE COURT:**  And in that --

19         **MR. LOPEZ:**  -- under indictment.

20         **THE COURT:**  Yeah, we did have the testimony about her

21  knowing which, you know, I'll deal with as well, but I still

22  think that we need to make a determination on this.  I would

23  like to make a determination on this as well.

24         **MR. LOPEZ:**  Very well, your Honor.

25         **THE COURT:**  Okay, so my hesitation is for tomorrow

1    morning.  And I don't know what our docket looks for -- like

2    for next week and -- for next week.  Well, so our options would

3    be this afternoon.  Really -- I think we really need to do it

4    this afternoon or next week.

5           MS. GUTIERREZ:  Your Honor, if I have to come back

6    this afternoon, then I will.  I just don't know that I'll have

7    enough time to research it, this, and --

8           THE COURT:  Well, I certainly don't want to limit

9    your time.  Is next week a problem?

10          MS. GUTIERREZ:  It is, your Honor.  However, I do

11   know that on the 26th in the morning I will be in Starr County

12   on a murder --

13          THE COURT:  Okay.

14          MR. LOPEZ:  Your Honor, --

15          MS. GUTIERREZ:  -- pretrial hearing.

16          MR. LOPEZ:  -- with the Court's indulgence and with,

17   I mean, Defendant -- I don't know how defense counsel feels

18   about it, but can we reconvene this afternoon and, to the

19   extent she feels comfortable to proceed, we can proceed?  If

20   she needs --

21          THE COURT:  I just --

22          MR. LOPEZ:  -- more time, the Government's

23   (indiscernible)

24          THE COURT:  Where do you office, Ms. Gutierrez?

25          MS. GUTIERREZ:  I office in Edinburg, south Edinburg.

1    But, your Honor, this is my plan.  My plan is to stay through

2    the rest --

3              **THE COURT:**  Obviously here, yeah.

4              **MS. GUTIERREZ:**  -- sentencings, hear that out, and so

5    by -- depending on what time we're set, --

6              **THE COURT:**  Yeah.

7              **MS. GUTIERREZ:**  -- it's not -- really not going to

8    give me that much time.

9              **THE COURT:**  Yeah, and I honestly don't know what time

10   we'll be finished either so there may be no real afternoon --

11             **MS. GUTIERREZ:**  Yes.

12             **THE COURT:**  -- okay.  Okay, then I'll -- other than

13   the 26th next week, Ms. Belmares, even if it is on a day when I

14   have civil matters or whatever.

15             **THE CLERK:**  The 27th?

16             **THE COURT:**  On the 27th?

17             **MS. GUTIERREZ:**  Your Honor, may I grab my calendar?

18             **THE COURT:**  So, okay, why don't you do that and then

19   we'll -- you can go ahead and be seated, Ms. Sandoval.  Why

20   don't you do that and we'll figure out what day we can pick

21   this back up again then on Ms. Sandoval?

22             **MR. LOPEZ:**  Your Honor, to the extent the Government

23   gets any information one way or the other, I'll file a

24   supplemental letter brief for the Court.

25             **THE COURT:**  Certainly.  And, Ms. Gutierrez, you can

 1    do the same thing but --

 2              **MS. GUTIERREZ:**  Very well, your Honor.

 3              **THE COURT:**  Okay, let's move then to Felix Hernandez.

 4              **MR. GARZA:**  Your Honor, we have presented one

 5    objection but I believe the Court had taken it up a little

 6    while ago and had made a ruling on it, Judge, which is the same

 7    one about trafficking, Judge.

 8              **THE COURT:**  Well, no, --

 9              **MR. GARZA:**  It is the issue that we --

10              **THE COURT:**  -- Mr. Hernandez did not have double

11    counting.  Mr. Hernandez had an enhancement under (b)(5) but no

12    enhancement under (b)(6) so there's no double-counting as to

13    him.

14              **MR. GARZA:**  Okay.

15              **THE COURT:**  Okay, so to the extent that you want to

16    argue that objection, I can --

17              **MR. GARZA:**  My objection was -- and I respectfully,

18    Judge, make a note on the objection that I had.  It was -- and

19    because we had several PSRs, we did address paragraph 64 and

20    18, Judge, and that basically was in reference to the

21    disposition of the transporting -- if I may read the objection,

22    Judge?

23              **THE COURT:**  Yes.

24              **MR. GARZA:**  Basically I said that there was, "No

25    evidence indicating that Mr. Hernandez had intended to

1    transport, transfer, or otherwise dispose of a firearm to

2    another individual."  He has never had any prior criminal

3    convictions, Judge, any prior dealings of trafficking firearms.

4    The cooperating -- the Court heard the testimony, your Honor.

5    Part of the questions that were asked, your Honor, is in

6    reference to whether these weapons were going to the north or

7    the south.  You know, in conferring with my client and even

8    asking the officer, the special agent, they didn't know, Judge.

9    They initially -- the persons that was cooperating in this

10   particular case was Zamudio, and I hate to say it but I'm going

11   to say it, your Honor, but the fact of the matter is he was --

12   he knew his role, he knew where he was.  The agent stated that

13   there was inconsistencies in the testimony from the beginning.

14   Fake statements were made, fake documentations, your Honor.  My

15   client in this was one of the individuals that was arrested at

16   the back end of the case.  And in talking with him and so

17   forth, all he did was a straw purchaser, that's what he did, he

18   purchased weapons.

19           **THE COURT:**  Well, and so that in part addresses part

20   of what your objection that no evidence that he's -- intends to

21   transfer the weapons.  And clearly he did because they were

22   straw purchases.  So that's part of the offense itself so --

23           **MR. GARZA:**  But the fact that he had knowledge, your

24   Honor, that these weapons were for Mexico, he had no knowledge.

25   I mean, he met these individuals in the neighborhood that they

1    were and --

2              **THE COURT:**  So let me address that.  And I have read

3    your objection as well.  The first thing to do, and this is

4    across the board as to all Defendants, to keep in mind that the

5    Court's ruling on these factual matters is based on a

6    preponderance of the evidence rather than beyond a reasonable

7    doubt; that in that regard, we do have some confirmation by the

8    documents of the nature of the purchases as amongst all these

9    individuals, that many of them or at least some number of them

10   were made by the individuals around the same time at the same -

11   - at the (indiscernible) that, you know, even by a minute they

12   were in close proximity so that there's knowledge across the

13   board that these are being made to -- sort of at the same time.

14   Now, I recognize that Mr. Hernandez did not himself make any

15   admissions at the time that he was initially being investigated

16   but, you know, he's the brother to Rene Hernandez, so we have

17   that.  And I think it would be -- or go against common sense to

18   believe that there is not some knowledge that is sort of shared

19   knowledge, transferred knowledge, in that regard.  It might not

20   be the case if they were, you know, living in different

21   locations, but clearly they are living in the same house.  That

22   there's no doubt that the weapons are in fact going to Mexico,

23   so it's not speculation about where they were actually going.

24   And I realize, you know, we have that after the fact, but

25   nonetheless that this is one of those cases that, taking into

1    account the type of weapons being purchased, the volume of

2    weapons being purchased, the connection between the various

3    Defendants here, the manner of transfer, and the general

4    knowledge of -- and I don't base my decision solely on the fact

5    that we live in this area that generally speaking, unless

6    you've been in a coma for the last ten years, that it is well-

7    known that the cartels seek these types of weapons and that the

8    cartels are very interested in purchasing these type of

9    weapons, that there is a lot of activity involved in the

10   trafficking of these kinds of weapons, and that it is almost a

11   constant, ongoing -- not almost, it is a constant, ongoing

12   issue.  And considering all those particular facts as they are

13   set out in the reports, that I don't think there's any doubt

14   that they are in fact going to Mexico.  And I don't know if

15   there's anything else that the Government would point out in

16   that regard.

17          **MR. LOPEZ:**  Judge, there's just one other fact that I

18   think is pertinent to this objection, is we also have

19   statements made that this individual was in possession of a bag

20   of 30 firearms and was talking to Mr. Zamudio about that same

21   bag of firearms and the subsequent transfer of that firearm I

22   think is pertinent to determining that he himself knew that he

23   was trafficking firearms.

24          **THE COURT:**  And, yes, I made a note of that and then

25   I forgot to mention that but that certainly also goes to that

1   as well.  And in making this determination, the Court considers

2   all the information presented in the PSR, as well as the

3   testimony from the agent.

4             **MR. GARZA:**  Your Honor, and just for purposes of the

5   record, Judge, yeah, Zamudio was making those statements.  And

6   the reason he was making those statements is because they were

7   self-serving on his behalf.  He knew his category, he knew he

8   was -- I go back, my client was arrested at the backend of this

9   case.  In approaching the Government, basically the case had

10  basically had already been compiled, they had already made

11  their decisions and, therefore, that was the decision that was

12  made.  However, when the agent came up here and testified, he

13  himself said, no, they initially told him they were going north

14  and, therefore, my client in that position -- he'd never been

15  involved in anything like this before, Judge.  You know, in

16  terms of -- you know, if you look at his history, even juvenile

17  history, being raised by a mother only, you know, and living in

18  the neighborhood that they lived, the resources and so forth,

19  it was something that was brought before him, two, $300 to --

20  one would lead to believe and that's the reason why I make the

21  objection vigorously, Judge, is the fact that he did have no

22  knowledge that it was going.

23            **THE COURT:**  Well, --

24            **MR. GARZA:**  He did accept responsibility and he will

25  accept responsibility for his actions --

1          **THE COURT:**  I think --

2          **MR. GARZA:**  -- because he did do the purchases.

3          **THE COURT:**  Okay, and the guidelines speak to knew or

4    had reason to believe.  And I think that the fact that he's

5    told one thing does not change the fact that he knew or had

6    reason to believe that they're going to Mexico.  Again, we're

7    looking -- for Mr. Hernandez specifically, we're looking at a

8    purchase of 15 weapons in the course of a month, okay?  And it

9    belies common sense -- and, again, he -- those are the weapons

10   that he personally purchases.  But he is certainly

11   knowledgeable of other weapons being purchased.  There's

12   brother's involvement here.  And it belies common sense, even

13   if you are told one thing, to believe that that is the case.

14   And so I -- you know, even accepting that he was told they're

15   going north, again, that belies common sense.  There's nothing

16   different from purchasing weapons here as, you know, anywhere

17   else in the United States.  You know, the background check is

18   a background check.  And so the Court does make a factual

19   determination in this case that this Defendant knew that the

20   weapons were going to Mexico.

21         **MR. GARZA:**  So the Court will overrule --

22         **THE COURT:**  Overrule --

23         **MR. GARZA:**  -- the objection.

24         **THE COURT:**  -- the objection.

25         **MR. GARZA:**  All right, your Honor.

1          **THE COURT:**  All right.  So I think for him that would

2    be the only legal -- the only objection to the guidelines that

3    remain, correct?

4          **MR. GARZA:**  That's correct, Judge.

5          **THE COURT:**  All right, okay.  All right, so then

6    again we'll come back to Mr. Felix Hernandez.  Let us move then

7    to Mr. Rene Hernandez.  Okay, and for Mr. Rene Hernandez, I

8    will start out by saying that he had the (b)(5) enhancement as

9    well as the (b)(6) enhancement, so the question to address

10   there is whether there is separate conduct for the (b)(5).  And

11   in that regard --

12         **MR. LOPEZ:**  Your Honor, the Government doesn't

13   believe that there's separate conduct in relation to this

14   Defendant.

15         **THE COURT:**  All right, so in that regard then the

16   Court will not impose -- and I don't -- there's been an

17   objection to the trafficking offense.  I think it's appropriate

18   to leave the trafficking one but to remove the other --

19         **MR. ROMERO:**  (Indiscernible)

20         **THE COURT:**  -- illegal activity under 67.  So there

21   will be no enhancement under paragraph 67 under (b)(6).

22         **MR. ROMERO:**  Okay, your Honor, and I think that

23   satisfies my objection on the trafficking in firearms.

24   Understanding the Court's prior ruling, so there's no need for

25   us to go over that.

1          **THE COURT:**  Okay.

2          **MR. ROMERO:**  With regards to the specific -- I didn't

3    make an objection, your Honor, to the specific offense

4    characteristics but if -- I did not become aware of this until

5    we had the agent on the stand, that both Mr. Cervantes and

6    Mr. Hernandez were purchasing at the same time.  And it wasn't

7    Cervantes purchasing for Mr. Hernandez but they were both

8    purchasing for Mr. Murillo.  Remember when I asked them to put

9    that up there?  So while it's true that he did purchase eight

10   firearms and that does put him in the other category, the four-

11   level enhancement seems a little high.  So with leave I would

12   make that objection, your Honor.

13         **THE COURT:**  But he actually purchased eight --

14         **MR. ROMERO:**  Eight, yes, ma'am.

15         **THE COURT:**  -- himself.

16         **MR. ROMERO:**  Yes, ma'am.

17         **THE COURT:**  So that would still put him in that plus

18   four.

19         **MR. ROMERO:**  I'm just suggesting, your Honor, that

20   giving the full four when it was at the very minimum is --

21         **THE COURT:**  The guidelines --

22         **MR. ROMERO:**  -- very severe.

23         **THE COURT:**  -- don't provide for a half point or even

24   a one point.  It goes from six --

25         **MR. ROMERO:**  Yes, ma'am.

1          **THE COURT:**  -- I guess from two to four to six.

2          **MR. ROMERO:**  All right.

3          **THE COURT:**  So that objection is overruled.

4          **MR. ROMERO:**  Yes, ma'am.  And then my next objection

5  is adjustment for role in the offense.  I think it's pretty

6  clear in this case based upon the testimony by the agent that

7  with regards to Ms. Sandoval, Mr. Ruiz was paid a finder's fee

8  for, you know, getting her involved in this case.  This is a --

9          **THE COURT:**  In that regard, I'll interrupt you.  I

10  think it should be a plus two.  And I don't know if the

11  Government has a position --

12          **MR. LOPEZ:**  The Government agrees, your Honor.

13          **THE COURT:**  Okay, so what I'm looking at is a plus

14  two, Mr. Romero.

15          **MR. ROMERO:**  And, your Honor, that's what I asked --

16          **THE COURT:**  Okay.

17          **MR. ROMERO:**  -- in the objection, so --

18          **THE COURT:**  Okay, so the Court will do a plus two as

19  to the role enhancement there.  So then for --

20          **MR. ROMERO:**  And the Court's already ruled on the

21  acceptance of responsibility and the other point.

22          **THE COURT:**  The -- as to all the Defendants, the

23  Court will grant the third point to the extent that it applies.

24  I don't remember in this case, we had I think maybe one

25  defendant where that was an issue, but I don't -- I'll look at

1    it individually.  But he does get the acceptance.  So what I

2    have then for Mr. Hernandez --

3              **MR. ROMERO:**  Is a 30?

4              **THE COURT:**  Let me --

5              **MR. LOPEZ:**  I have a 27-1 after acceptance.

6              **MR. ROMERO:**  Yes, yeah.

7          **(Pause)**

8              **THE COURT:**  I agree, 27, and so the guideline range

9    is -- I keep pulling the chart and I keep --

10             **MR. LOPEZ:**  Seventy to 87, your Honor.

11             **THE COURT:**  -- hiding it away.

12             **MR. ROMERO:**  Seventy to 87.

13             **THE COURT:**  Okay, 70 to 87 for Mr. Hernandez, okay.

14             **MR. LOPEZ:**  That's correct, your Honor.

15             **THE COURT:**  All right, then let's move to

16   Mr. Murillo.  All right, let me get to your objections here.  I

17   will say there's -- there are a lot of objections that are

18   factual in nature, and certainly to the extent that any one of

19   those applied to any of the Court's determinations, you know,

20   I'll rule on them.  But to the extent that there are sort of --

21   some of them going generally to some of these objections, I'll

22   sort of encompass them within the ruling on the objection.

23             **MR. BALLESTEROS:**  And that would be one through nine,

24   Judge.  Those were more factual and for clarification purposes.

25   And, Judge, I'd also like to note for the Court that

1    Mr. Murillo has accepted responsibility on this case --

2              THE COURT:  And did we get something from him?  I

3    didn't have it at --

4              MR. BALLESTEROS:  I will tender to the Court a

5    document signed by Mr. Murillo on January 25th of 2017 and --

6              THE COURT:  Was that ever filed with the Court or

7    what?

8              MR. BALLESTEROS:  And, Judge, there was some

9    confusion on my part.  There was several filings in May.  We

10   called the Court's staff and requested or asked how to file the

11   acceptance with your court, but I believe it was never done.

12   But because some of the filings in May were sealed, I couldn't

13   verify that yesterday.  It probably wasn't.

14             THE COURT:  Yeah.

15             MR. BALLESTEROS:  And just to be sure, I had my

16   office file it today in the morning and I'm tendering --

17             THE COURT:  All right.

18             MR. BALLESTEROS:  -- a copy of it to the Court.

19             THE COURT:  It is sufficient, the Court will grant

20   the two points on the acceptance.  And it has been filed as --

21             MR. BALLESTEROS:  It was filed today --

22             THE COURT:  Okay.

23             MR. BALLESTEROS:  -- in the morning before 8:30.

24             THE COURT:  So if it was filed, then I'll give you

25   back the original copy then.

1          **MR. BALLESTEROS:**  Okay.

2          **THE COURT:**  Okay.

3          **MR. BALLESTEROS:**  And then, Judge, on Mr. Murillo, I

4   think the Court has addressed it on the double-counting as far

5   as paragraph --

6          **THE COURT:**  To the extent that both are the going to

7   Mexico, yes.  If there's a separate independent basis, then

8   obviously that's a different situation.  And, again, we have

9   the issue as far as Rene Hernandez here.  And I guess we didn't

10  specifically address that --

11         **MR. LOPEZ:**  Your Honor, I didn't address that with

12  Mr. Hernandez because I felt like that was taken care of in his

13  base offense level so I didn't want it double-counting in that

14  situation.

15         **THE COURT:**  Right.

16         **MR. LOPEZ:**  And in regards to Mr. Murillo, because of

17  the individual that he subsequently transferred it to, I can't

18  identify whether he had any knowledge of whether that

19  individual was a prohibited person.  In this case, I feel like

20  it also as well as based on the Court's prior ruling would

21  result in double-counting.  I don't have an alternative base

22  for Mr. Murillo, other than the exportation.

23      **(Pause)**

24         **THE COURT:**  Okay, so then we -- as to Mr. Murillo,

25  though, again we will not apply paragraph 67, the (b)(6)

1    enhancement.

2         **MR. BALLESTEROS:**  And if I may proceed then with the

3    adjustment for the role of the offense.  The PSR classified

4    Mr. Murillo as a plus four, leader/organizer of five or more

5    individuals.  There has been testimony -- and the PSR refers to

6    Pedro Ruiz who was never indicted or charged.  There's been

7    conflicting or different testimony, and even in the

8    Government's chart, as to whether or not that qualified as the

9    -- as five individuals or not, so we would respectfully ask the

10   Court to consider Mr. Murillo as a plus two instead of a plus

11   four.

12        **THE COURT:**  I'm not sure when you say whether that

13   qualified as another individual, but clearly the testimony was,

14   and what's reflected in the PSR, is that Mr. Ruiz was involved

15   in the recruitment of Ms. Sandoval, that he -- you know, and I

16   don't recall reading anything that he himself actually

17   approached, but certainly he was involved and he received a

18   finder's fee so to speak for that recruitment, so clearly he

19   would be somebody that is a participant here and --

20        **MR. BALLESTEROS:**  Judge, and if I may, it speaks

21   specifically to Mr. Ruiz.  That wasn't indicated in any of the

22   reports provided by the Government.  It is our position

23   Mr. Ruiz is a cousin of Mr. Murillo, he dated Ms. Sandoval, he

24   mentioned Ms. Sandoval as having potentially dealings with

25   weapons, and Mr. Murillo approached her.  And so there was --

1  it's our position that there was no finder's fee, that they

2  never got together and were -- he was introduced to

3  Ms. Sandoval by Mr. Ruiz but the relationship with Mr. Murillo

4  and Ms. Sandoval, I know it's hard to decipher that from the

5  reports and then based on the testimony as well, but it's our

6  position that he never received a finder's fee and that he

7  never introduced Ms. Sandoval to Mr. Murillo for the purpose of

8  purchasing weapons.  They were introduced because they're

9  related and they hung out together and they were acquainted

10 that way.

11         **THE COURT:**  Well, the report does indicate, you know,

12 and maybe it doesn't say specifically Pedro Ruiz introduced

13 Sandoval to Murillo for the purposes of, so I will admit that,

14 but nonetheless it does indicate that he made the

15 introductions, that then later she met with Ruiz and Murillo I

16 think before they even exchanged the rifles, that they advised

17 her about filing the false report.  So, again, whether or not

18 he's paid is not dispositive, but the fact is that he is a

19 participant here and maybe if he were charged you might end up

20 only with an aiding and abetting at least.  But certainly I see

21 here that he is also a participant here.  But -- so that's part

22 of it, but the other one is also looking at the otherwise

23 extensive.  I mean, look at what we have here.  I mean, --

24         **MR. BALLESTEROS:**  And I --

25         **THE COURT:**  -- certainly this is otherwise extensive.

1              **MR. BALLESTEROS:**  And, Judge, again on the backend of

2     then misleading law enforcement making up this report, that

3     might be true but, again, it was done separately.  Whether

4     Ms. Sandoval sought advice from Mr. Ruiz, it was independent --

5     our position is that it was independent from Mr. Murillo.

6              Otherwise extensive, that's where I thought the Court

7     was going to be focusing on based on the involvement of

8     Mr. Murillo.  Again, at this point, there are several weapons

9     that were purchased.

10             **THE COURT:**  Okay.

11             **MR. BALLESTEROS:**  Most of them -- it's our

12     position --

13             **THE COURT:**  I think this is one case where we could

14     say a multitude of weapons, not just several.

15             **MR. BALLESTEROS:**  My wife does not like that word,

16     Judge, because I use it too often in my -- on my behalf.  But

17     multiple weapons were purchased and I just believe that it's

18     our position that it was being done through Mr. Cervantes.  I

19     know the testimony is a little bit different on that.  And then

20     other individuals were also purchasing and making a quick buck.

21     And so if the Court is going to overrule it based on that, we

22     certainly understand.

23             **THE COURT:**  I really do think it's -- but I don't

24     know if there's anything that the Government would add.

25             **MR. LOPEZ:**  Your Honor, the only thing that the

1    Government would add is the Government does believe that this

2    is otherwise extensive given the nature of the scheme.  But in

3    addition, your Honor, there's other individuals that would meet

4    the five people.  You have Alexander Cardenas (indiscernible)

5    and Mariano Garcia who's another Defendant in this case who

6    also purchased guns for this individual.  We're clearly over

7    five.

8            **THE COURT:**  I agree.  That objection is overruled.

9            **MR. BALLESTEROS:**  And then the accounting of the

10   weapons, Judge.  I know this is very difficult for the agent

11   and for the prosecution as it is for the Court and as it was

12   for us in determining the actual amount of weapons.  Just based

13   on the agent's testimony and the Government's chart, we've

14   requested it be reduced to less than 25 instead of over 25.

15           **THE COURT:**  In that regard, the Court was certainly,

16   you know, very careful as it went through the report and in

17   considering the testimony.  I think that the 25 is established

18   at the very, very least because I think -- and at least from

19   your cross examination it didn't appear that you effectively

20   disputed the 18, so we look at that to begin with.  And that 18

21   does not include the four weapons subject of Count One.  And I

22   understand your -- and I do understand your position, but let

23   me finish here.  Okay, so it doesn't include those four, okay.

24   And then as I understood it, he was arrested with one weapon as

25   well.

1          **MR. LOPEZ:**  That's correct, your Honor.

2          **THE COURT:**  Okay, so it doesn't include that one as

3    well.  But then we have the evidence clearly that Felix

4    Hernandez and --

5          **MR. LOPEZ:**  Mariano Garcia.

6          **THE COURT:**  -- Garcia also were involved in the

7    purchase of weapons for Mr. Murillo, and between those two, if

8    I recall correctly, the total there --

9          **MR. LOPEZ:**  Mariano Garcia had nine, --

10          **THE COURT:**  Nine.

11          **MR. LOPEZ:**  -- three of which we can directly

12   attribute to part of Mr. Murillo.  Felix Hernandez had 15.

13   While the Government's not able to separate exactly how many

14   were purchased for Mr. Murillo or Mr. Zamudio, the Government

15   can say at least one of those was purchased for Mr. Murillo.

16          **THE COURT:**  Yeah, so I think between all of those, I

17   have no doubt that the evidence here establishes, you know, the

18   -- actually I think it may be more than 28, but certainly at

19   least the 25.

20          **MR. BALLESTEROS:**  And, Judge, I guess that was part

21   of the point that we were trying to make with the chart.  The

22   15 that were included on the -- on Hernandez already included

23   the seven from --

24          **THE COURT:**  Cervantes.

25          **MR. BALLESTEROS:**  -- Cervantes.

1           **THE COURT:**  Correct, no, I understand that.  So we

2   have the seven from Cervantes, the eight from Hernandez, and

3   the three from Sandoval, so that's --

4           **MR. BALLESTEROS:**  That's 18.

5           **THE COURT:**  -- 18 right there.

6           **MR. BALLESTEROS:**  And then the ones he was involved

7   in the accident prior to this investigation, those are four

8   that were also attributed there, --

9           **THE COURT:**  I --

10          **MR. BALLESTEROS:**  -- plus the one that he was

11  arrested with.

12          **THE COURT:**  I understand that.  So what I'm saying is

13  that there's five weapons there, okay, but he -- even

14  considering sort of a -- some fluctuation there, then we have

15  between Hernandez and Garcia also other weapons being purchased

16  here --

17          **MR. BALLESTEROS:**  I just respectfully think that

18  those weapons on the other Hernandez, Felix, who doesn't know

19  my client, and Garcia, that those -- they don't have a way to

20  link them other than speculating that he was buying for --

21          **THE COURT:**  No.  Well, no, we have the Defendants

22  themselves as far as, you know, some of the statements.  And,

23  again, I recognize what the agent testified to, that there was,

24  you know, some statements that were to begin with flat out

25  false, some statements that were inconsistent, but they sort of

1    put all of this together and tried to come up with the picture

2    that can sort of rise from all of that, and I do believe that

3    there is sufficient evidence here to establish at least 25 as

4    to Mr. Murillo.  All right, so that objection is overruled.

5    And I think that took care of the legal objections.

6             **MR. BALLESTEROS:**  That is correct, your Honor.

7             **THE COURT:**  Okay, all right.  So then for

8    Mr. Murillo, I think the only one that was sustained was as to

9    paragraph 67.  We have the acceptance now so where do we end

10   for --

11            **MR. LOPEZ:**  A 31-1, your Honor, I believe.

12            **THE COURT:**  Is that what you come up with?

13            **U.S. PROBATION OFFICER TIJERINA:**  That's correct,

14   your Honor.

15            **THE COURT:**  Okay, that puts us at 108 to 135.  Of

16   course, we're at the ten-year maximum so 120 really.  Okay, all

17   right, having then taken care of the legal objections, I think

18   I'm going to work backwards and I'll start with Mr. Murillo.

19   And at this time let me have all of the Defendants go ahead and

20   stand up and raise your right hand to be sworn in so that I

21   don't inadvertently forget somebody.  Each one of you please

22   raise your right hand to be sworn in.

23       **(Defendants sworn)**

24            **THE COURT:**  All right, thank you.  Then other than

25   Mr. Murillo, you may be seated.  Okay, then as to Mr. Murillo,

1  Mr. Ballesteros, anything else that you want to add?

2          **MR. BALLESTEROS:**  Just --

3          **THE COURT:**  And I'm sorry, one other thing.  We also

4  have forfeiture so any one of the Defendants can also --

5          **MR. LOPEZ:**  The forfeiture is only as to Mr. Murillo,

6  your Honor.

7          **THE COURT:**  Okay, so you can address that as well.

8          **MR. BALLESTEROS:**  Yes, Judge.  And so we would ask

9  the Court to consider the 3553(a) factors on Mr. Murillo.  We

10  submitted a sentencing memo reflecting that Mr. Murillo has had

11  lawful employment since the age of 16.  He has two children,

12  his wife, who's present along with his mother and friends and

13  family.  One of his sons does -- was diagnosed at the age of

14  one, which is around the time when Mr. Murillo kind of got his

15  life back together, he stopped doing drugs, stopped smoking

16  marijuana, and right now his son is in remission.  There was

17  several letters of support from his teachers and his doctors

18  indicating how much support Mr. Murillo actually provided to

19  both of his children.  So we'd ask the Court to consider that

20  in determining Mr. Murillo's sentence, if there's a potential

21  for variance or departure there.  I think Mr. Murillo also

22  provided a letter to the Court and would like to say something.

23          **THE COURT:**  Mr. Murillo?

24          **DEFENDANT MURILLO:**  Yes, your Honor.  I want you to

25  know that I regret doing what I did.  I know it's wrong and I

 1    will never do it again.  I know I have to face the consequences

 2    of my actions.  And if you will find it from the kindness of

 3    your heart to let me be home by the time my son graduates from

 4    elementary, which is (indiscernible) I would really appreciate

 5    it.  I just don't want to miss out that much time for my little

 6    boy who's growing up.  I know I should have thought about that

 7    before getting in trouble.  The reason why I did that was to

 8    support my family.  But I promise, your Honor, that I -- that

 9    when I get out, I will work hard to provide for my family.

10    That's all I have to say, your Honor.

11         **THE COURT:**  I thank you.  Anything from the

12    Government as to Mr. Murillo?

13         **MR. LOPEZ:**  Yes, your Honor.  The Government does

14    believe -- the Government understands that a guideline sentence

15    is a stiff sentence in light of this Defendant's criminal

16    history, but nonetheless the Government does believe that a

17    guideline sentence is appropriate.  This is a Defendant who

18    trafficked multiple firearms.  And the history of it is what I

19    think is probably most important and most telling, in 2012 this

20    Defendant was involved in a stolen vehicle report that involved

21    the trafficking of firearms to Mexico to cartel bosses in

22    Mexico, and fortunately for the Defendant was not prosecuted

23    federally or on the State side for that action.  Nevertheless,

24    the Defendant still doesn't understand that, continues to be

25    involved in other activity.  He gets arrested in connection

1    with the 55 kilogram cocaine load, and despite being on bond,

2    despite being under indictment, still continues to engage in

3    possessing firearms, not to mention straw purchasing firearms

4    and being involved with other individuals straw purchasing

5    firearms. Even after the arrest warrant is issued, he again is

6    found after he's been interviewed by ATF agents with other

7    firearms. This Defendant simply doesn't learn and is a

8    defendant that has ties to the cartel with related gun violence

9    and significant amounts of guns, your Honor. The Government

10   believes that a guideline sentence is appropriate in light of

11   the actions that he's taken.

12       **THE COURT:** Mr. Murillo, the Court is -- was there

13   something else?

14       **MR. BALLESTEROS:** We would like for this case to run

15   concurrent with any other case that might be pending, Judge.

16   And there was mentioned I think in the sentencing memo that the

17   Defendant, Mr. Murillo, be considered for the RDAP program as

18   well.

19       **THE COURT:** All right, thank you. Mr. Murillo, the

20   Court has considered all the information presented here, both

21   by way of the presentence investigation report and what we've

22   heard here live in the courtroom. And I'll start out with the

23   fact that I recognize that you are young, and I recognize that

24   many, many times young people, you know, give little thought to

25   consequences of their action and give little thought to the

1    future, that whatever they're doing now may sort of hold.  But

2    I think this is one of those cases, Mr. Murillo, where your age

3    really does not speak to the offense here.  We have a situation

4    here -- and I will begin, you know, I was troubled as I read

5    the report with the 2012 conviction for false report.  You

6    know, I can't deny that that troubled me.  And part of what

7    concerned me there of course is the knowledge.  And putting

8    aside, let's -- assuming for a moment that, you know, that

9    happened in 2012 and that between then and 2015 you were

10   completely clean of anything else; although, again, we do have,

11   you know, an indication maybe otherwise.  But nonetheless, just

12   putting that aside, nonetheless I think the knowledge is there

13   already about what we have going on with the cartels and with

14   weapons and with guns going there.  And so then we have you

15   involved in this offense where I think rather than sort of

16   straightening up because of your knowledge from 2012, you

17   actually become a little bit more sophisticated in this offense

18   because of your knowledge from 2012.  That is that in this

19   offense, rather than you specifically going out and, you know,

20   attempting at least you can't at this point in time purchase

21   the weapons but, you know, you go out and involve yourself by

22   getting others to purchase these weapons.  And we're not

23   talking here again about, you know, two or three.  We're

24   talking here about a multitude.  I've only held you accountable

25   for 28.  I think that's a very conservative number.  But I

1    think it was clear that you understood fully what was involved

2    here, that you had no hesitation about doing it, Mr. Murillo.

3    And I don't doubt that you were doing it for the money.  It

4    sounds like a very lucrative business.  But there are scores of

5    people here -- not scores, thousands of people here in the

6    Valley who struggle financially every single day.  And it is

7    not an excuse to say, well, I engaged in criminal activity

8    because my family needs the money.  If that was the case, then

9    I would say that a majority of people in the United States

10   would be criminals.  And that is not the case.  People struggle

11   day by day and manage how they can.  And sometimes families go

12   hungry, sometimes electricity is turned off, sometimes they

13   don't get to the doctor, but they don't turn to criminal

14   activity.  And I think in your case, it may have been in part,

15   you know, to provide for your family but I think part of it was

16   also just, you know, in your view this was easy money to be

17   made.  It causes problems, Mr. Murillo, not simply in Mexico

18   but it causes problems here as well.  And though somewhat

19   sporadic, we have instances here in the Valley now where the

20   cartels execute individuals and, you know, they're generally

21   individuals also involved in criminal activity.  But we do not

22   believe in vigilante justice here in the United States.  And

23   some of this, you know, is all, you know, related to drug

24   trafficking obviously, but part of it is because of the fact

25   that they are more and more getting their hands on weapons that

1    this is possible.

2          Under all the circumstances here, Mr. Murillo -- and

3    the Court has considered all the 3553(a) factors here -- the

4    Court does believe that a sentence within the guideline range

5    is necessary.  Again, in doing so I have taken into account not

6    just the guidelines themselves but, you know, the particular

7    facts as they apply to you.  And even considering your youth,

8    Mr. Murillo, the Court believes that it is necessary to

9    sentence you to something that is not completely at the low end

10   of the guideline range.  The Court is going to sentence you to

11   115 months in custody.  In doing so, as I've indicated I've

12   taken into account the 3553(a) factors, but those reflected

13   within the guidelines as well as the need to provide for the

14   safety of the community, to deter further criminal conduct, and

15   to promote respect for the law.

16         The Court is also placing you on a three-year term of

17   supervised release.  While you are on supervised release, you

18   are not to commit another Federal, State, and local crime.  You

19   are to comply with the standard conditions adopted by the

20   Court.  Additionally, you are not to possess a firearm,

21   ammunition, destructive device, or any other dangerous weapons.

22         The Court does also order that you participate in a

23   drug and alcohol treatment program as deemed necessary by the

24   Probation Office, and also that you participate within the

25   Bureau of Prisons, if that is available to you in this case.

1          And although generally I would not order this run

2     concurrent with a State charge that is pending because I've

3     not, you know, calculated that into the guideline range, in

4     light of the lengthy sentence here, Mr. Murillo, the Court will

5     grant that request and order it run concurrent should the State

6     proceed on those drug charges that are currently pending.

7          Mr. Murillo, you do have the right to appeal.  If you

8     wish to appeal, you need to advise your attorney.  The appeal

9     needs to be filed with 14 days.  If you cannot afford an

10    appeal, you may file for *in forma pauperis* in which case the

11    Clerk will file your notice of appeal and the Court will

12    appoint appellate counsel.

13          Anything else as to Mr. Murillo?

14         **MR. LOPEZ:**  Your Honor, the Government moves to

15    dismiss the remaining counts, your Honor.  And as to the

16    forfeiture, the Government moves that those weapons be

17    forfeited.

18         **THE COURT:**  Okay, yeah, I failed to address I think

19    that and fines, correct.  Okay, so as to the forfeiture, the

20    Court will also grant the Government's request for forfeiture.

21          And then, Mr. Murillo, part of the Court's sentence

22    is also that you are ordered to pay a $100 special assessment,

23    and the Court will waive the fine.  Anything else?

24         **MR. BALLESTEROS:**  That'll be it, your Honor.  May I

25    be excused?

**THE COURT:**  You may, thank you.

**MR. BALLESTEROS:**  Thank you.

(Requested transcription regarding Jesus Murillo concluded at 11:47 a.m.; proceeding continued)


**CERTIFICATION**


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____          _August 30, 2017_



TONI HUDSON, TRANSCRIBER